# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2008

Charles R. Fulbruge III
Clerk

No. 07-40616

PATRICK KIRKSEY

Plaintiff-Appellee

V.

TONGHAI MARITIME; COSCO BULK CARRIER COMPANY LTD., DOING
BUSINESS AS COSCO BULK

Defendants-Third Party Plaintiffs-
Appellants,

V.

PAN OCEAN SHIPPING CO., LTD.; STX PAN OCEAN CO. LTD.,

Third Party Defendants-
Appellants.

Appeal from the United States District Court
for the Southern District of Texas
USCA No. 3:05-CV-57

Before HIGGINBOTHAM, DAVIS, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is an appeal in a 33 U.S.C. § 905(b) action from a judgment in favor
of longshoreman, Patrick Kirksey, against the owner, operator, and charterer of
a vessel, following a bench trial. The district court concluded that the unstable
stow of the cargo made the vessel dangerous to the unloading longshoremen and

that the vessel owner failed to exercise reasonable care to turn the ship over to the stevedore in such condition that a reasonably competent stevedore could safely unload it. Because the record is uncontradicted that the dangerous condition in the cargo stow found by the district court was open and obvious to the stevedore, we reverse and render.

I.

In the fall of 2004, the M/V TONGHAI left Korea bound for Mexico and the United States with a load of steel products. The ship encountered heavy seas while crossing the Pacific Ocean. After calling on two other ports, the vessel arrived in Houston on December 11, 2004.

On December 14, 2004, Kirksey was working in a longshoremen gang for a stevedore, P&O Ports Texas, Inc. ("P&O"), which was under contract with the vessel charterer to unload the vessel. On that morning, Kirksey reported to work at City Dock #26, Port of Houston, to continue unloading the M/V TONGHAI. The vessel was owned by Tonghai Maritime ("Tonghai"), under charter to Pan Ocean and operated by Cosco Bulk Carrier Co., Ltd. ("Cosco") (sometimes referred to collectively as "shipowner"). Kirksey named Tonghai and Cosco as defendants, and P&O intervened for reimbursement of benefits it paid Kirksey under the Longshore and Harbor Workers' Compensation Act ("LHWCA").[1]

On the day of the accident, Kirksey was a member of a five man longshoreman crew discharging coiled steel and other steel products from the vessel's No. 5 hold. Four members of the crew were in the hold, and a fifth man operated the vessel's crane to hoist the coils out of the hold.

Pan Ocean and P&O performed a joint survey of the cargo in the No. 5 hold before unloading began. Thomas O'Keefe represented Pan Ocean, and

---

[1] 33 U.S.C. § 901 et seq.

James Stemwedel represented P&O. O'Keefe found the steel coils to be safely stowed. Stemwedel disagreed and found the stow unstable. Neither surveyor reported any dangerous condition to representatives of either the stevedore or the vessel owner or the charterer or advised anyone that the unloading could not proceed safely.

On the afternoon of December 13, the day before the accident, Kirksey's gang discharged the top tier of steel coils without incident. On the morning of December 14, the men began discharging the second tier of coils. Kirksey was standing on the floor of the No. 5 hold, and Gibson, another member of his crew, stood on top of the four ton coil to be lifted. They worked together to attach the lifting straps to the coil, which were to be attached to the crane hook for lifting. During the process of securing the lifting straps to the coil in question, someone on the deck called for the band cutter to be sent topside for use in another hold. One of the men standing on top of the coils, either Valley or Gibson, hooked a band cutter onto the crane hook rig to be sent up to the deck. The coil to be unloaded tipped over and fell on Kirksey just as the band cutter was being lifted out of the hold. Kirksey lost a leg and suffered other serious injuries.

Gibson testified that he believed the end of the lifting strap he was holding became entangled in the hook rig as the band cutter was lifted. The district court, however, did not credit this testimony but rather credited the testimony of Colquitt, another crew member, who testified that the crane line was well out of the way when the coil tipped over and fell. The court found that "the vibrations caused by the operation of the vessel's crane jarred the already poorly stowed coil loose, causing it to tip over onto Kirksey."

The district court found that the coils and steel pipe were poorly stowed, which made it difficult to discharge the cargo. The court accepted Capt. Stemwedel's testimony on this point, along with Kirksey's testimony and the testimony of two members of his crew, based on their observation of leaning coils

and uneven dunnage. The district court concluded that because of negligence of the loading stevedore or shifting of the cargo in the heavy seas encountered during the voyage, or both, the stow was unstable, and this created a dangerous condition. The court also accepted Capt. Stemwedel's opinion that once the longshoremen encountered the cargo stowed as it was, they did the best they could under the circumstances and that their only real choice was to unload the cargo or leave the job.

Based on these findings, the district court concluded that the vessel owner failed to exercise reasonable care to have the vessel in such condition that an expert and experienced stevedore could safely unload the vessel. The district court also faulted the vessel for failing to warn the stevedore that the vessel had encountered heavy seas on the voyage, which would have alerted the stevedore to possible shifting of the cargo, creating a danger to the unloading longshoremen.

In summary, the district court found that the "dangerous condition of the stow — the leaning coils, the inadequate dunnage, the lack of uniformity in the stow — was the overwhelming proximate cause of Kirksey's injuries." The court assigned fault 45% to vessel owner/operator, 45% fault to charterer Pan Ocean, and 10% to Kirksey.

Our review of the record leads us to conclude that the version of the accident as found by the district court – although hotly contested – is supported by the record, and those findings are not clearly erroneous.

Although the district court made no explicit finding on whether the unstable condition of the stow was open and obvious, our review of the record reveals no dispute about this fact. The district court's findings on the unstable nature of the stow are largely based on surveyor Stemwedel's report of his survey of the cargo in the # 5 hold before the unloading began. Indeed, the district court describes the stow as: "improper stowage such as is seen in

Stemwedel's photos attached to this report." These photographs were taken before the unloading operations began.

Based upon the facts as found by the district court, we now turn to the legal issue of the duty owed by the shipowner under these circumstances and whether there was a breach of that duty.

II.

The merits of this case turn on Kirksey's rights under 33 U.S.C. § 905(b) against the defendants vessel owner and charterer. The Supreme Court, in Scindia Steam Nav. Co., Ltd. v. De Los Santos, has limited the duties vessel owners owe under § 905(b).[2] In Greenwood v. Societe Francaise de, we stated that "[t]he basic principle which emerges from Scindia is that the primary responsibility for the safety of the longshoreman rests upon the stevedore."[3]

It is now well accepted that shipowners owe three narrow duties to longshoremen: (1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene.[4] Kirksey's suit against the vessel owner in this case is predicated solely upon its breach of the turnover duty. Consequently, the only issue before us is whether the district court erred in concluding that the shipowner breached that duty. The turnover duty applies to the shipowner's obligation before or at the commencement of the stevedore's activities.

This duty places two responsibilities on the vessel owner. First, the owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on

---

[2] 451 U.S. 156, 165 (1981); see also Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92. 98 (1994).

[3] 111 F.3d 1239, 1245 (5th Cir. 1997) (quoting Randolph v. Laeisz, 896 F.2d 964, 970 (5th Cir. 1990)).

[4] Howlett, 512 U.S. at 98; see also generally Scindia, 451 U.S. 156.

stevedoring operations with reasonable safety.[5]  Second, the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it;[6] however, the duty to warn of hidden dangers is narrow.[7]  It does not include dangers which are either: (I) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering.[8]

Kirksey argued, and the district court found, that the shipowner in this case violated its turnover duty by failing to exercise ordinary care to turn over the ship in a safe condition so as to allow the stevedore to safely perform its work and by failing to warn the stevedore that the vessel had encountered rough seas during the voyage creating a risk of unstable cargo stow.  Because it is uncontested that the stevedore was fully aware of the alleged hazardous condition of the cargo stow, the narrow question presented by this case is whether the district court erred in allowing Kirksey to recover from the shipowner, given the open and obvious nature of  the defect in the cargo stow and the corresponding danger it created.

The Supreme Court's decision in Howlett v. Birkdale Shipping Co., S.A., clearly answers this question in the affirmative with respect to Kirksey's failure to warn claim. In Howlett, a longshoreman was working with a stevedoring crew engaged in unloading a vessel.  After partially unloading a portion of a hold, a sheet of plastic on which the unloaded cargo had rested was exposed.  The plaintiff jumped to the deck, landed on the plastic, and slipped and injured

---

[5] See Federal Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 416–17 & n.18 (1969).

[6] Howlett, 512 U.S. at 99–100.

[7] Id. at 99–100; 105.

[8] Id. at 100–01.

himself. He had expected to land on other less slippery material, such as paper or plywood.

Plaintiff argued that the shipowner violated its turnover duty by failing to warn that plastic, rather than a safer material, had been improperly placed under the cargo. The shipowner asserted the open and obvious defense. The district court and the court of appeals held that because the hazard was open and obvious, the shipowner had no duty to warn.[9] On review, the Court describing the vessel's duty to warn, stated:

> In sum, the vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work.[10]

In this case, the district court's findings make it clear that the stevedore, through its surveyor, and the longshoremen on the job were well aware of the condition of the cargo stow. Therefore, under Howlett, the shipowner had no obligation to warn against this obvious danger.

Kirksey argues further that the shipowner owed a duty to warn the stevedore that the ship had encountered particularly heavy seas crossing the Pacific, thus increasing the risk of an unstable stow. We conclude that Howlett also forecloses this argument. If the shipowner had no obligation to warn of an obviously defective stow, it can have no duty to warn of an incident that creates a risk of shifting cargo and an unstable stow. Knowledge that the vessel encountered heavy seas and weather would not be helpful to the stevedore in

---

[9] Id. at 95.

[10] Id. at 105.

assessing the risk its longshoremen would face in unloading the vessel when the stevedore has actual knowledge of the conditions in the hold.[11]

Thus, Howlett confirmed the availability of the open and obvious defense to the turnover duty to warn. The Court, however, made it clear that it did not definitively decide whether this defense was applicable to the turnover duty to provide a reasonably safe vessel. Thus, although Howlett is not dispositive on this issue, the Court's analysis is helpful to us in resolving this question.

- In developing the contours of the turnover duty to warn, the Court emphasized that the turnover duty must be defined in relation to the role of the stevedore and the shipowner.[12]

- The shipowner has a right to expect "that the stevedore would perform with reasonable competence and see to the safety of the cargo operations."[13]

- The Court reiterated its Scindia reasoning that the imposition of a duty on the vessel to inspect and supervise cargo operations would "undermine Congress' intent in §5(b) to terminate the vessel's 'automatic faultless responsibility for conditions caused by the negligence or other defaults of the stevedore,' and to 'foreclose liability based on a theory of unseaworthiness or non-delegable duty.'"[14]

- The Howlett Court then stated that:

  The foregoing principles, while taken from Scindia Steam's examination of the vessel's duty to intervene, bear as well on

---

[11] See Marino v. Kent Line Int'l, Ltd., 02-4488, 2003 WL 22519449, at *4 (E.D. Pa. Oct. 3, 2003).

[12] See Howlett, 512 U.S. at 99–100.

[13] Id. at 101 (quoting Scindia, 451 U.S. at 172).

[14] Id. at 101–02 (quoting Scindia, 451 U.S. at 168, 172).

the nature of the vessel's turnover duty, and hence on the case before us. We consider first Howlett's view that a vessel must make reasonable inspections during stevedoring operations to ensure a proper stow and to detect any hazards or defects before they become hidden. The beneficiaries of this proposed duty would be longshoremen who unload or otherwise deal with the cargo at later ports. But if, as we held in Scindia Steam, a vessel need not supervise or inspect ongoing cargo operations for the benefit of longshoremen then on board, it would make little sense to impose the same obligation for the benefit of longshoremen at subsequent ports. In practical effect, then, adopting Howlett's proposal would impose inconsistent standards upon shipowners as to different sets of longshoremen[] and would render much of our holding in Scindia Steam an empty gesture.[15]

- The Court also considered the plaintiff's argument that a vessel must inspect the stow after stevedoring operations are complete to discover hazards in the stow:

There is good reason to doubt that adopting this rule would have much practical import. Any hazard uncovered by a shipowner who inspects a completed stow would, as a matter of course, be discovered in a subsequent port by a stevedore "reasonably competent in the performance of his work." As discussed above, shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow. . . . Once loading operations are complete, it follows that any dangers arising from an improper stow would be "at least as apparent to the [stevedore] as to the [shipowner]."[16]

Thus, most of the same considerations Howlett gives for permitting the shipowner to assert an open and obvious defense to a failure to warn claim

---

[15] Id. at 102–03.

[16] Id. at 104 (quoting Scindia, 451 U.S. at 167; Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 366 (1962) (Stewart, dissenting)).

strongly support making the same defense available to the shipowner defending against a claim based on the general failure to provide a safe ship based on defects in the stow.

Our conclusion is confirmed by a closely analogous case from the Ninth Circuit, Riggs v. Scindia Steam Navigation Co.[17] In that case, the loading stevedore had improperly stowed the cargo of pipe which was strewn throughout the hold in an obviously hazardous manner. The longshoreman brought suit against the vessel owner asserting that the owner and time charterer had negligently failed to provide him a reasonably safe place to work. The district court granted summary judgment for the vessel owner, holding that the vessel had no legal duty to prevent or alleviate the unsafe conditions in the cargo hold because the dangers were open and obvious to the longshore workers. The Ninth Circuit Court of Appeals reversed, holding, in effect, that the open and obvious defense did not absolve the vessel owner of the turnover duty to provide a reasonably safe vessel.[18] Under the Ninth Circuit's reasoning, an open and obvious hazard may be unreasonably dangerous and, therefore, constitute a breach of the turnover duty to provide a reasonably safe vessel.[19] The Supreme Court granted certiorari and vacated the judgment and remanded the case to the United States Court of Appeals for further consideration in light of Howlett.[20] On remand, the Ninth Circuit announced that "consistent with the Howlett decision, we now affirm the district court's grant of summary judgment to the

---

[17] 8 F.3d 1442 (9th Cir. 1993).

[18] Id. at 1447.

[19] Id. (citing Martinez v. Korea Shipping Corp., Ltd., 903 F.2d 606, 609–10 (9th Cir. 1990)).

[20] Scindia Steam Nav. Co. v. Riggs, 512 U.S. 1216 (1994).

vessel."[21] We are persuaded that the Ninth Circuit correctly concluded that the reasoning, if not the letter of the Howlett opinion, compelled this result.

In an unpublished opinion, Clay v. Daichi Chhuo Shipping (America), Inc., we affirmed a judgment from the Eastern District of Louisiana,[22] which reached the same conclusion.[23] In Clay, the vessel departed Japan loaded with steel coils and steel pipe. The cargo was discharged from the forward end of Hold No. 1 in Houston, without incident. The ship arrived in New Orleans and was inspected and accepted by the stevedore for discharge. While discharging loose pipe stowed against the ship's bulkhead, the pipe hook slipped out of the end of the pipe, and the pipe rolled over Clay. Clay maintained that stowage of the pipe against the bulkhead, requiring the longshoremen to break out the pipe, created an unreasonably dangerous condition. The longshoremen had been unloading the pipe stowed against the bulkhead for more than two hours before the accident, and the district court found that the alleged dangerous condition was obvious to them.[24]

The Court first concluded that under Howlett, the duty to warn did not include the duty to warn of open and obvious dangers or something a reasonably competent stevedore should anticipate encountering. The court then turned to the question of whether the open and obvious defense was available to the shipowner's more general obligation to turn over a reasonably safe vessel. After discussing Howlett and Riggs, the court concluded:

> A fair reading of these opinions compels the conclusion that the open and obvious defense is applicable to the turnover duty to

---

[21] Riggs v. Scindia Steam Nav. Co., Ltd., aff'd on remand, 35 F.3d 1466 (9th Cir. 1994).

[22] See Clay v. Daiichi Shipping, 74 F.Supp.2d 665 (E.D. La. 1999).

[23] 237 F.3d 631 (5th Cir. 2000) ("The judgment is AFFIRMED for essentially the reasons stated by the district court in its Order and Reasons dated November 10, 1999.").

[24] 74 F.Supp.2d at 672.

provide a safe vessel and that a vessel owner has no legal duty to prevent or alleviate an unsafe condition in the cargo hold resulting from an improper stow when the condition is open and obvious to the longshore workers. While this result seems harsh, it is motivated by the conviction that a contrary result would put all costs on the party who is least able to avoid the accident: the vessel. More importantly, it is believed that imposing liability on the vessel owner would completely remove the incentive to act with caution from the party who is in the best position to avoid accidents: the stevedore.[25]

We agree with this analysis. Given the Howlett Court's clear language strictly limiting the vessel's turnover duty to warn to latent defects and dangers, it makes no sense to say that the vessel is nevertheless liable to the longshoremen for breach of the duty to turnover a safe ship based on an obvious defect against which it had no duty to warn.[26]

Kirksey relies on three cases decided by this Court before the Supreme Court decided Howlett: Lemon v. Bank Lines, Ltd.;[27] Harris v. Flota Mercante Grancolombiana, S.A.;[28] and Woods v. Sammissa Co., Ltd.[29]

In Lemon, which was decided shortly after the Supreme Court decided Scindia but before Howlett was decided, a longshoreman was injured while attempting to walk around defectively stowed cargo. A panel of this Court reversed the district court's direction of a verdict in favor of the shipowner, even

---

[25] Id. at 671 (citing Quevedo v. Trans-Pacific Shipping, Inc., 143 F.3d 1255, 1258 (9th Cir. 1998)). See also Greenwood v. Societe Francaise De, 111 F.3d 1239, 1248 (5th Cir. 1997).

[26] See Samuel A. Keesal, Jr. et al., Shipowners' Liability for Longshoremen Personal Injuries: The Supreme Court Blocks the "Importation" of Unseaworthiness, 7 U.S.F. Mar. L.J. 67, 106–08 (1994).

[27] 656 F.2d 110 (5th Cir. 1981).

[28] 730 F.2d 296 (5th Cir. 1984).

[29] 873 F.2d 842 (5th Cir. 1989).

though the defect was open and obvious. It is clear to us that Howlett undermines the Court's reasoning. For example, the Court stated:

> The Court [in Scindia] specifically imposed a duty on the shipowner to at least warn the stevedore of any dangerous condition, existing at the outset of the stevedoring operations, of which the shipowner should have been aware through the exercise of reasonable care.[30]

In Harris, also decided before Howlett, we reversed a judgment based on a directed verdict when the longshoreman unloading the vessel was injured because of a defective cargo stow. Harris is based in part on the shipowner's active negligence in deciding not to use adequate dunnage to stabilize the cargo. To the extent Harris follows the reasoning of Lemon,[31] it is also undermined by Howlett.

In Woods, a longshoreman was injured due to an obviously defective cargo stow. The panel, relying on Harris and Lemon in this pre-Howlett case, held that the jury was entitled to find that the shipowner violated its general turnover duty to provide a safe ship. The following summary of its holding demonstrated that the court's reasoning is also undermined by Howlett.

> All that is required [to impose liability on the vessel] is that the injury that results from the failure to exercise due care be reasonably foreseeable . . . and in this case a reasonable owner/operator and time charterer would have perceived the dangers presented by the overlapping condition of the cargo.[32]

Some time was required after the 1972 amendment to the LHWCA for the law to develop with respect to the duty the shipowner owes the longshoreman under § 905(b). The Supreme Court's decision in Howlett was a major step in that development. We are satisfied that our pre-Howlett decisions discussed

---

[30] Lemon, 656 F.2d at 116.

[31] See Harris, 730 F.2d at 299–300.

[32] Woods, 873 F.2d at 852.

above are undermined by the Supreme Court's 1994 decision in Howlett and that they do not control this case.

Finally, Kirksey argues that he had no alternative but to unload the coils or to leave the job. This is a narrow exception, which has no application here. We have generally applied this exception where the dangerous condition existed in the ship's equipment or was otherwise created by the shipowner through its negligence.[33]

The only case in which we have applied the "no alternative" exception to a stow (rather than a defect in the ship's equipment) is where the shipowner controlled the manner and method of the stow and created the dangerous condition.[34] However, here, there is no evidence that the shipowner negligently created the dangerous condition in the stow, and the exception, therefore, is inapplicable.[35] Imposing liability without fault on the shipowner under these circumstances is inconsistent with the Congressional objectives of § 905(b) to

---

[33] See, e.g., Moore v. M/V ANGELA, 353 F.3d 376, 380-81 (5th Cir. 2003) (imposing liability under "no alternative" exception where longshoreman was killed due to malfunctioning ship's crane, where vessel owner had actual knowledge that the crane had been seriously malfunctioning and where there was no practical alternative); Burchette v. Cargill, Inc., 48 F.3d 173, 178 (5th Cir. 1995) (imposing no liability under "no alternative" exception where longshoreman was not required to climb on hatch with hazardous condition); Pimental v. LTD Canadian Pacific Bul, 965 F.2d 13, 16 (5th Cir. 1992) (imposing no liability under "no alternative" exception where oil and grease on deck could have been easily remedied by longshoreman); Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 166-67 (5th Cir. 1990) (imposing liability under "no alternative" exception for slippery condition on main deck where longshoreman had no alternative route); Harris, 730 F.2d at 299 (imposing liability under "no alternative" exception where owner knew of and contributed to dangerous stow condition by not ordering dunnage); Pluyer v. Mitsui O.S.K. Lines, Ltd., 664 F.2d 1243, 1244-47 (5th Cir. 1982) (imposing liability under "no alternative" exception where plaintiff was injured while using unsafe ship's ladder furnished by the vessel); Martinez v. Korea Shipping Corp., Ltd., 903 F.2d 606, 610-11 (9th Cir. 1990)(finding fact question existed as to whether open and obvious unguarded ladder opening on lashing platform created unreasonably dangerous condition).

[34] See Harris, 730 F.2d at 299.

[35] See also Clay, 74 F.Supp.2d 665, aff'd, 237 F.3d 631.

"foreclose [the vessel's] liability 'based on a theory of unseaworthiness or non-delegable duty.'"[36]

### III.

Because the defect in the cargo stow found by the district court was open and obvious to the stevedore, the vessel had no turnover duty to warn against the defect or to correct the unsafe condition. Consequently, the vessel has no liability for breach of either the turnover duty to warn or to furnish a reasonably safe ship. We therefore reverse the judgment in favor of the plaintiff and render judgment in favor of defendants.

REVERSED and RENDERED.

---

[36] Howlett, 512 U.S. at 101–02 (quoting Scindia, 451 U.S. at 172).