*470 MOTZ, Circuit Judge,
dissenting:
With respect, I dissent. In my view, the focus of the parties on the shipowner’s promise, rather than the character of the icy conditions, and the alternatives Bunn had in facing those conditions, left the jury with insufficient evidence to find Oldendorff breached its turnover duty.[1]
I.
At the center of my disagreement with the majority is the question of whether a shipowner’s unfulfilled promise to remedy an open and obvious hazard affects its turnover duty.
It is well established that § 905(b) of the Longshore and Harbor Workers’ Compensation Act imposes upon a shipowner a narrow turnover duty. See Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 166-67, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); Kirksey v. Tonghai Mar., 535 F.3d 388, 391 (5th Cir.2008). This duty “relates to the condition of the ship upon the commencement of stevedoring operations” and “has two components.” Lincoln v. Reksten Mgmt., 354 F.3d 262, 266 (4th Cir.2003).
First, a shipowner must exercise “ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.” Scindia, 451 U.S. at 166-67, 101 S.Ct. 1614 (emphasis added). This duty is known as the turnover duty of safe condition. See, e.g., Ludwig v. Pan Ocean Shipping Co., 941 F.2d 849, 851 (9th Cir.1991).[2]
As a corollary to the turnover duty of safe condition, a shipowner must also
warn[ ] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.
Scindia, 451 U.S. at 167, 101 S.Ct. 1614 (emphasis added). This duty is known as the turnover duty to warn. See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 99, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).
Thus, § 905(b) imposes on a shipowner duties at turnover that are very narrow. See Kirsch v. Plovidba, 971 F.2d 1026, 1029 (3d Cir.1992) (“[T]he shipowner’s duty is only to provide a workplace where skilled longshore workers can operate safely.”); see also Scindia, 451 U.S. at 170, *471 101 S.Ct. 1614. The turnover duty of safe condition merely requires that a shipowner exercise ordinary care, under the circumstances, to provide an expert and experienced stevedore or longshoreman, who exercises reasonable care, the ability to carry out its operations with reasonable safety. Scindia, 451 U.S. at 166-67, 101 S.Ct. 1614. The corollary turnover duty to warn requires only that a shipowner exercise ordinary care to provide to a reasonably competent stevedore or longshoreman notice of non-obvious hazards. Id. at 167, 101 S.Ct. 1614.
Indeed, the openness and obviousness of a hazard to a stevedore provides a shipowner with a complete defense to a turnover duty to warn claim, no matter how unreasonably dangerous the hazard. See Kirksey, 535 F.3d at 393. The majority errs in asserting that a shipowner has a duty to warn a stevedore of even an open and obvious hazard if the stevedore “is [un]able to conduct ... operations around [the hazard] safely.” Ante at 461, 465. In fact, the Supreme Court has explicitly rejected this view of the turnover duty to warn:
The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work.
Howlett, 512 U.S. at 105, 114 S.Ct. 2057; see also Ludwig, 941 F.2d at 851 (“The shipowner had no duty to warn Ludwig [the longshoreman] of the hazard. It was obvious, so its mere presence carried a warning.”).
Of course, the openness and obviousness of a hazard does not absolve the shipowner of its turnover duty of safe condition. See Manuel v. Cameron Offshore Boats, Inc., 103 F.3d 31, 34 (5th Cir.1997); Kirsch, 971 F.2d at 1029-30; Ludwig, 941 F.2d at 851. But when a hazard is open and obvious, the shipowner has a diminished turnover duty of safe condition. See, e.g., Kirksey, 535 F.3d at 395-96; Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 409 (3d Cir.2006); Keller v. United States, 38 F.3d 16, 24 (1st Cir.1994); Pimental v. LTD Can. Pac. Bul, 965 F.2d 13, 16 (5th Cir.1992); Ludwig, 941 F.2d at 851-52.
As the Third Circuit has explained, “a shipowner may be negligent for failing to eliminate an [open and] obvious hazard that it could have eliminated ... only when it should have expected that an expert stevedore [or longshoreman] could not or would not avoid the hazard and conduct cargo operations reasonably safely.” Kirsch, 971 F.2d at 1031 (emphasis added).
This standard recognizes that “a shipowner can, ordinarily, reasonably rely on the stevedore [and longshoremen] ... to notice obvious hazards and to take steps consistent with [their] expertise to avoid those hazards where practical to do so.” Id. at 1030; see also Howlett, 512 U.S. at 101, 114 S.Ct. 2057; Ludwig, 941 F.2d at 852.[3] An expert and experienced longshoreman can avoid open and obvious hazards in a number of ways, for example by fixing the hazard himself, see Albergo v. *472 Hellenic Lines, Inc., 658 F.2d 66, 69 (2d Cir.1981), or completing operations while avoiding the hazard, see Bjaranson v. Botelho Shipping Corp., Manila, 873 F.2d 1204, 1208 (9th Cir.1989); Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A., 832 F.2d 67, 70 (5th Cir.1987). So long as an expert longshoreman has available such an option, a shipowner cannot be held liable for a breach of its turnover duty of safe condition. Rather, the shipowner can reasonably rely on the longshoreman to exercise an alternative option.
II.
The majority largely ignores the above principles. Instead, relying primarily on Lieggi v. Maritime Co. of Philippines, 667 F.2d 324 (2d Cir.1981) and two similar active operations duty cases, the majority holds that “a shipowner may be liable under the Act for promising, yet failing, to remedy a dangerous condition that injures a longshoreman.” Ante at 462.[4] The case at hand, however, does not concern the active operations duty. And the logic of the active operations duty does not extend to the turnover duty context.
Contrary to the majority’s suggestion, a “stark contrast” exists between the turnover duty and the active operations duty. See Davis v. Portline Transportes Mar. Internacional, 16 F.3d 532, 537 (3d Cir.1994). The turnover duty covers the shipowner’s conduct before the stevedore’s cargo operations have begun, while the active operations duty covers a shipowner’s conduct after cargo operations have begun in those areas remaining under control of the shipowner. See Scindia, 451 U.S. at 167, 101 S.Ct. 1614; Davis, 16 F.3d at 537.
The active operations duty does not rest on whether an expert stevedore and its expert longshoremen could have completed operations with reasonable safety. Instead, that duty rests on whether a shipowner negligently exposes longshoremen to any hazards — even avoidable ones — in areas under the shipowner’s control during stevedoring operations. See Serbin v. Bora Corp., Ltd., 96 F.3d 66, 70 (3d Cir.1996). For this reason, the obviousness of a hazard does not presumptively bar recovery under an active operations duty claim. Id. at 75-76; Pimental, 965 F.2d at 16.
But the obviousness of a hazard does presumptively bar recovery under a turnover duty claim. See Kirksey, 535 F.3d at 395-96; Kirsch, 971 F.2d at 1031; Pimental, 965 F.2d at 16; Ludwig, 941 F.2d at 851-52. And a shipowner’s pre-turnover promise to remedy an open and obvious hazard does not itself affect the openness and obviousness of the hazard at turnover. Rather, a shipowner can reasonably rely on an expert stevedore and its expert longshoremen to notice and avoid an open and obvious hazard. See Kirksey, 535 F.3d at 394; Kirsch, 971 F.2d at 1030.[5]
Moreover, a shipowner’s promise to remedy a hazard does not create a duty actionable under § 905(b). This is so because in the absence of a “contract provi *473 sion, positive law, or custom to the contrary,” all § 905(b) claims must fall under one of the duties identified by the Supreme Court in Scindia. See 451 U.S. at 172, 101 S.Ct. 1614; Kirsch, 971 F.2d at 1031. An expert and experienced longshoreman cannot, by the mere virtue of a shipowner’s promise, shirk his duty to act with reasonable care in the face of an open and obvious hazard. Holding otherwise raises a promise to the level of a contract, and impermissibly shifts responsibility for longshoreman safety from stevedore (and the longshoreman himself) to shipowner.
As long as an unremedied hazard remains open and obvious, a shipowner’s liability to an injured longshoreman is thus extremely limited. Absent a contract provision, statute, regulation, or custom to the contrary, Scindia, 451 U.S. at 172, 101 5.Ct. 1614, the shipowner is liable only to the extent “it should have expected that an expert stevedore [or longshoreman] could not or would not avoid the hazard and conduct cargo operations reasonably safely,” Kirsch, 971 F.2d at 1031.
III.
Considering the evidence in the light most favorable to Bunn, and with these legal principles in mind, I cannot agree with the majority’s disposition of this appeal.
“[I]n many cases the obviousness of a hazard ... will be a jury question,” Kirsch, 971 F.2d at 1033, and if that were the situation here, I would join the majority in sustaining the jury’s verdict. But, both before this court and in the district court, Bunn expressly conceded that “the ice-covered condition of the deck was open and obvious.” Resp. Br. at 18; see also Bunn v. Oldendorff Carriers GmbH & Co. KG., No. 1:10-cv-00255-WMN (D.Md. Nov. 18, 2010), ECF No. 27, at 6. This concession took this important question out of the hands of the jury at trial, and binds us as we consider the proper application of the law on appeal.
Given this concession, the only remaining question is whether the evidence permitted a reasonable jury to conclude that the shipowner, Oldendorff, violated either component of its turnover duty by turning over the ship with open and obvious icy conditions. It seems to me that the answer to that question is certainly no.
The parties focus on the turnover duty to warn,[6] and the majority extensively discusses that duty, sometimes suggesting that Oldendorff violated it. See ante at 463-66. But the majority ultimately characterizes this discussion as “plenty of dicta,” [7] and expressly disavows it as a basis *474 of its holding. The majority explains that its “affirmance of the judgment is based not on the duty to warn but on the more general turnover duty of safe condition.” Ante at 466 (emphasis original); see also ante at 460 (“[Liability does not depend on the duty to warn.”). This disavowal seems appropriate and inevitable given the clear directive of Howlett — that the duty to warn “attaches only to latent [not obvious] hazards.” 512 U.S. at 105, 114 S.Ct. 2057 (emphasis added).
However, affirmance on the basis of the turnover duty of safe condition — the sole basis for the majority’s holding — is not possible because no evidence at trial established a violation of this duty. That is, the jury had insufficient evidence to find that the shipowner, Oldendorff, “should have expected that an expert [longshoreman] could not or would not avoid the hazard [here, icy conditions near hold three] and conduct cargo operations reasonably safely.” Kirsch, 971 F.2d at 1031.[8]
Indeed, the only relevant evidence presented to the jury on this critical point suggests that an expert longshoreman, in Bunn’s position, might have avoided this open and obvious hazard in several ways. He might have avoided the icy condition near hold three altogether by loading another hold or undertaking another task. Cf. Burchett v. Cargill, Inc., 48 F.3d 173, 179 (5th Cir.1995); Bjaranson, 873 F.2d at 1208. Alternatively, he might have cleared the ice himself, see Pimental, 965 F.2d at 16; Albergo, 658 F.2d at 69, or enlisted a crew member to do so, see Kirsch, 971 F.2d at 1034. Of course, these options and others may have been unavailable to Bunn, but the record provides no evidence to this effect.
Nor does the record contain any evidence that Bunn was required to finish the job quickly, making him unable to avoid the hazard. See Teply v. Mobil Oil Corp., 859 F.2d 375, 378 (5th Cir.1988). To the contrary, Bunn’s shift supervisor provided unrebutted testimony that if a longshoreman encounters a hazardous condition on a ship “[h]e is empowered to shut the operation down.” JA 133. And another longshoreman, Moxey, did shut down operations when the icy conditions around hold three remained hazardous several hours after Bunn’s fall. JA 92.[9]
Implicit in the majority’s holding may be the view that an expert and experienced longshoreman would be unable to distinguish between treated and untreated ice and so have no reason to pursue another option. This may be so, but the record contains no evidence on this point either.
Of course, as the majority notes, Bunn argues in his briefs that “the lack of treat *475 ment with sand and salt in the area where [he] was obliged to work was not open and obvious.” See, e.cj., Resp. Br. at 18. No evidence, however, supports this argument. Rather, at trial, Bunn himself testified that in well-lit areas of the ship he could distinguish between treated and untreated portions of the deck. JA 178, 226-27. Only in the dark, “very poor[ly]” lit area around hold three was Bunn unable to tell whether the ice had been treated. JA 182-83. Bunn’s own testimony therefore supports just one conclusion: that his failure to notice the icy conditions was solely because it was dark, not because treated and untreated ice are indistinguishable. See Resp. Br. at 19 (conceding that “Mr. Bunn ... had testified ... that the darkness in the area around No. 3 hatch prevented [him] from discovering that the ice in that area had not been treated.”).
But to the extent that darkness constitutes a hazard, it is assuredly obvious, and easily remedied by an expert longshoreman (or indeed anyone with a flashlight). See, e.g., Harris v. Pac.-Gulf Marine, Inc., 967 F.Supp. 158, 164-65 (E.D.Va.1997); Chapman v. Bizet Shipping, S.A., 936 F.Supp. 982, 986 (S.D.Ga.1996); Landsem v. Isuzu Motors, Ltd., 534 F.Supp. 448, 451 (D.Or.1982), aff'd, 711 F.2d 1064 (9th Cir. 1983) (table). Therefore, darkness provides no basis for a shipowner’s liability under its turnover duties. Nor can darkness render an obvious hazard latent. Cf. Harris, 967 F.Supp. at 164; Chapman, 936 F.Supp. at 986. Otherwise the scope of a shipowner’s turnover duties on identically hazardous ships could differ depending solely on the time of day when the turnover occurred.[10]
In response to this record evidence and these legal principles, the majority is left to contend that not just poor lighting but also the unfulfilled promise and a purported custom of shipowners removing on-board ice constitute the “totality of the circumstances” that renders Oldendorff liable. Ante at 467 n. 15 (emphasis in original). But, as explained above, like poor lighting, an unfulfilled promise does not render an otherwise obvious hazard latent. See ante at 472-73. And Bunn has never even argued that custom (rather than the turnover duty) forms the basis for his claim. See ante at 474 n. 9. Thus, the record provides no support for the view that the totality of these circumstances barred Oldendorff from reasonably relying on an expert longshoreman in Bunn’s position to notice and avoid the obvious icy conditions. See Kirksey, 535 F.3d at 394; Kirsch, 971 F.2d at 1030.[11]
*476 In sum, the record is bereft of evidence that Oldendorff “should have expected that an expert [longshoreman] could not or would not avoid the hazard [here, icy conditions] and conduct cargo operations reasonably safely,” Kirsch, 971 F.2d at 1031, and contains considerable evidence suggesting the contrary. Accordingly, the jury lacked an evidentiary basis to find that Oldendorff breached its turnover duty of safe condition.
IV.
This is a complex case, made only more so by the parties’ failure to develop facts concerning the character of the icy conditions and the alternatives Bunn had in facing those conditions. On the one hand, the record does not provide a legally sufficient evidentiary basis from which a jury could find that Oldendorff breached its turnover duty. On the other hand, the record does not clearly foreclose Oldendorffs possible liability for violating its turnover duty. Rather, the record is simply inadequate to allow a jury to resolve— one way or the other — the dispositive legal question in the case: whether “an expert [longshoreman] could not or would not avoid the hazard and conduct cargo operations reasonably safely.” Kirsch, 971 F.2d at 1031.
The Supreme Court has recognized that in limited circumstances “where the court of appeals sets aside the jury’s verdict because the evidence was insufficient to send the case to the jury,” as I believe it was here, “it is not so clear that the litigation should be terminated.” Neely v. Martin K. Eby Const. Co., 386 U.S. 317, 327, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967). In my view, this is such a case. Accordingly, I would vacate the judgment of the district court and remand the case for a new trial or other proceedings consistent with this opinion. See Fed.R.Civ.P. 50(b); Weisgram v. Marley Co., 528 U.S. 440, 451-52, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000); Neely, 386 U.S. at 327-330, 87 S.Ct. 1072.

. I agree, for the reasons well stated by the majority, that Oldendorff s appeals of the district court’s order denying summary judgment and its jury instructions are not properly before us.

. “Although the turnover duty of safe condition is usually framed in terms of stevedores, it is clear that danger to longshore workers is an essential part of the inquiry.” Thomas v. Newton Int’l Enters., 42 F.3d 1266, 1270 n. 4 (9th Cir.1994) (emphasis original). Turning over a ship upon which an expert stevedore can complete its operations with reasonable safety necessarily requires turning over a ship upon which the longshoremen — the stevedore’s expert employees who actually perform the operations — can complete their duties with reasonable safety. Id.; accord Kirsch v. Plovidba, 971 F.2d 1026, 1029-30 (3d Cir.1992). Hence, when determining whether a shipowner has breached its turnover duty of safe condition, "the focus of the factual inquiry is frequently directed at experienced long-shore workers” — not just their expert stevedore employer. Thomas, 42 F.3d at 1270 n. 4; accord Kirksey, 535 F.3d at 396; Lincoln, 354 F.3d at 266; Kirsch, 971 F.2d at 1029-30.

. The negligence of a stevedore does not bar an injured longshoreman's recovery from a negligent shipowner. See Woodruff v. United States, 710 F.2d 128, 131-32 & n. 7 (4th Cir.1983). However, a shipowner breaches its turnover duty of safe condition only when an expert stevedore and its expert longshoremen could not through reasonable care carry on operations with reasonable safety. See Scindia, 451 U.S. at 166-67, 101 S.Ct. 1614; Kirsch, 971 F.2d at 1029. If, through reasonable care, operations could have been completed with reasonable safety, the inquiry ends there, regardless of how negligent the stevedore has been.

. The active operations duty requires a shipowner after turnover “not to take negligent actions in areas under its control that threaten the longshoremen's safety.” Serbin v. Bora Corp., Ltd., 96 F.3d 66, 70 (3d Cir.1996); see also Scindia, 451 U.S. at 167, 101 S.Ct. 1614.

. The case at hand only involves a shipowner’s turnover duty regarding open and. obvious hazards. A shipowner's promise to remedy a hazard that is neither known nor open and obvious may affect the manner in which an expert and experienced stevedore reasonably performs its operations. In short, if a hazard is not open and obvious, a stevedore would have reason to rely on a shipowner's representation that the hazard would be removed.

. Contrary to the majority’s suggestion, ante at 463, 469, Bunn deserves as much blame as Oldendorff for focusing on the turnover duty to warn. Both before the district court and on appeal, Bunn did little to prioritize or offer evidence in support of his turnover duty of safe condition claim.

. In the course of this dicta, the majority asserts that, although the ice on the ship was open and obvious, the "presence of untreated ice was assuredly not 'open and obvious.’ ” Ante at 463. Howlett, however, cannot be avoided simply by characterizing the ice as "untreated.” This is so because, by definition, ice and untreated ice are the same hazard. Just as a shipowner’s unfulfilled promise to remedy an open and obvious hazard— here icy conditions — does not render the hazard any less open and obvious, so too a shipowner’s failure to treat the hazard does not render it any less open and obvious. Whether one frames the hazard in this case as "ice” or "untreated ice,” it remains equally open and obvious, and Howlett forecloses any turnover duty to warn claim.
Later in its own dicta, the majority relies on dicta in Lincoln contending that a shipowner has a duty to warn a stevedore of even open and obvious hazards if the stevedore "is [unjable to conduct ... operations around [the hazard] safely.” Ante at 465. But, as noted *474 above, Howlett simply does not permit this conclusion. For in Howlett the Supreme Court expressly and clearly held that "[t]he duty [to warn] attaches only to latent hazards.” 512 U.S. at 105, 114 S.Ct. 2057 (emphasis added).

. The majority, focusing solely on the unfulfilled promise of the shipowner (by Fediv), effectively ignores this most fundamental inquiry into whether an expert longshoreman could have "by the exercise of reasonable care ... carr[ied] on [his] cargo operations with reasonable safety to persons and property.” Scindia, 451 U.S. at 166-67, 101 S.Ct. 1614.

. Bunn does not argue that a "contract provision, positive law, or custom” forms the basis of his § 905(b) claim. See Scindia, 451 U.S. at 172, 101 S.Ct. 1614. Indeed, by regulation, it is the duty of the stevedore to "eliminate conditions causing slippery walking and working surfaces in immediate areas used by employees.” 29 C.F.R. § 1918.91. Thus, the general principle that a shipowner can reasonably rely on an expert stevedore and its expert longshoremen to notice and avoid an open and obvious hazard applies with full force to this case. See Kirsch, 971 F.2d at 1030; Ludwig, 941 F.2d at 852.

. The regulatory scheme governing stevedoring operations supports the conclusion that natural darkness cannot contribute to the latency of a hazardous condition; for it is the stevedore's — not shipowner’s — duty to provide an illuminated workspace for cargo operations, and to provide longshoremen with flashlights or other portable lights. See 29 C.F.R. § 1918.2, .92; see also Scindia, 451 U.S. at 176, 101 S.Ct. 1614 (“The statutory duty of the stevedore under [33 U.S.C.] § 941 to provide a safe place to work has been implemented by the Safety and Health Regulations for Longshoring. 29 CFR § 1918.1 et seq.").

. For, as we explained long ago, a shipowner is "entitled to rely on [a stevedore's] judgment as to whether discharge operations could safely be undertaken.” Bonds v. Mortensen & Lange, 717 F.2d 123, 127-28 (4th Cir.1983). There, we reversed a verdict for a longshoreman killed by a crane with a malfunctioning bell on the ground that the hazard was “known to all” and was avoidable. Id. We explained that this is “not a situation ... in which the longshoremen were precluded from performing their tasks except by a means which was inherently dangerous.” Id. at 127-28 & n. 5. That logic would seem to require, at the very least, that in this case we vacate the verdict and remand the case for further proceedings, as I propose.