# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 31, 2021

Lyle W. Cayce
Clerk

No. 21-30004

Pradeep Patil,

*Plaintiff—Appellant*,

*versus*

Amber Lagoon Shipping GmbH & Company; Macs
Maritime Carrier Shipping GmbH & Company,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-6167

Before Stewart, Ho, and Engelhardt, *Circuit Judges*.

Per Curiam:*

In this case arising under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), the district court granted summary judgment in favor of Defendants-Appellees Amber Lagoon Shipping GmbH & Company and Macs Maritime Carrier Shipping GmbH & Company

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-30004

(collectively "Defendants") and dismissed Plaintiff-Appellant Pradeep Patil's claims in their entirety. We AFFIRM.

I.

Patil is a surveyor with 45 years of experience in the maritime industry. He is employed by Maritech Commercial, Inc. ("Maritech"), a company that independently contracts to perform ultrasonic testing of the hatch covers situated atop the holds of the *M/V Amber Lagoon*, a vessel owned and operated by Defendants. Ultrasonic testing is a procedure whereby a vessel's hatch covers are battened down, and a tester sets up an ultrasonic transmitter inside the hold, walks around the belly of the hatch cover while pointing an ultrasonic signal detector at the hatch cover's seal, and takes decibel readings to identify any leakage in the seal.

On March 17, 2016, Maritech sent Patil to perform ultrasonic testing on the hatch covers of Holds One, Two, and Three of the *Amber Lagoon*, while the vessel was docked in Houston, Texas. On the day of testing, the captain of the *Amber Lagoon* requested that Patil test the hatch covers on Hold Four as well. The holds on the *Amber Lagoon* rise six feet above the main deck, and each hold is split into port-side and starboard-side sections, with a three-foot-wide gap between those two sections. There are port-side and starboard-side hatch covers on top of each hold. Each hold contains port-side and starboard-side access ladders, which allow individuals to ascend and descend between the main deck and the hatch covers.

Patil conducted the ultrasonic testing from the tops of the hatch covers rather than from the main deck, because the ultrasonic signal detector works more effectively at the higher level. Sebastian Kedziora, the *Amber Lagoon*'s second officer, accompanied Patil throughout the testing period and marked areas of potential leakage identified by Patil with a permanent marker. Patil used the access ladders to ascend and descend both sides of

2

Holds One through Three and the starboard side of Hold Four without issue. Patil also used the access ladder to ascend the port side of Hold Four without issue.

Around 6:00 p.m., Patil finished his work for the day by completing his testing of the port-side hatch cover of Hold Four. Patil noticed that the port-side access ladder he had previously used to reach the top of the hold had become blocked by cargo containers and was no longer a viable method of descending to the main deck. Patil asked Kedziora to retrieve the ultrasonic transmitter that Patil had set up inside Hold Four and bring it back to the main deck. Kedziora jumped across the three-foot gap between the port and starboard sides, descended the starboard-side access ladder to the main deck, and began climbing through a manhole in the deck to reach the inside of Hold Four. Patil decided to cross the three-foot gap as well, but he chose not to jump the gap, because he was older and less nimble than Kedziora. Instead, Patil sat down on the port-side ledge and attempted to swing his right leg over the gap and place his right foot onto the starboard-side ledge; however, Patil's right foot slipped, and he fell six feet to the main deck, suffering a small forehead laceration and a left-heel fracture.

As Kedziora was climbing into the manhole, he saw Patil fall out of the corner of his eye. Kedziora and other *Amber Lagoon* crewmembers rushed to Patil's assistance, rendered first aid, and called an ambulance to take Patil to the emergency room. At the hospital, Patil received x-rays and a CT scan, which revealed no problems beyond the forehead laceration and left-heel fracture. Patil's injured foot was placed in a pneumatic boot, and he was released from the hospital on the same day of his accident. Patil took three months of paid medical leave based on his heel injury and ultimately underwent heel surgery.

No. 21-30004

On June 22, 2018, Patil filed this lawsuit against Defendants, alleging negligence claims under the LHWCA. *See* 33 U.S.C. § 905(b). Specifically, Patil alleged that he sustained severe and disabling injuries when he slipped and fell due to a "foreign substance" on or near the hatch covers of the *Amber Lagoon*.

Patil testified in his deposition that he did not actually observe a foreign substance in the area of his slip-and-fall, but assumed that he slipped on "some grease," because the cleats attached to vessel hatch covers are typically greased so that they slide easily through ledge holes. Patil further testified that at some point after the accident, he returned home, examined his work boots worn on the date of the accident, and noticed "a little bit" of grease on the tip of one boot. Patil further testified as to his surrounding conditions at the time of the accident: (1) although the sun had begun to set, there was still daylight in the area; (2) the *Amber Lagoon*'s lighting was not yet on, but Patil indicated that he did not yet need lighting for visibility; and (3) the *Amber Lagoon* was docked and stable in terms of movement.

Kedziora testified in his deposition that the cleats on the *Amber Lagoon*'s hatch covers are usually greased with lubrication oil to prevent corrosion and that the *Amber Lagoon* crew was responsible for ensuring that Patil's inspection areas were free of grease. Kedziora further stated that, in preparation for Patil's ultrasonic testing work, the chief officer of the *Amber Lagoon* followed the vessel's standard operating procedure by sending multiple crewmembers to examine Patil's testing areas for grease and clean the surfaces of the hatch covers with rags and chemicals. Kedziora testified that, before the accident, he did not observe any type of foreign substance in the area of Patil's slip-and-fall, nor did Patil advise Kedziora of the presence of any foreign substance.

Patil's medical records from the date of the accident and an employee injury report do not mention a foreign substance in the area of the slip-and-fall.

Defendants moved for summary judgment. The district court granted summary judgment in favor of Defendants and issued a final judgment dismissing Patil's claims with prejudice. In its written reasons, the district court concluded that Patil failed to show that Defendants breached their "turnover duty," "active control duty," or "duty to intervene" under § 905(b) of the LHWCA. *See* 33 U.S.C. § 905(b); *see also Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156 (1981). This appeal followed.

## II.

We conduct a de novo review of a district court's grant of summary judgment, applying the same standard as the district court. *Robinson v. Orient Marine Co. Ltd.*, 505 F.3d 364, 365 (5th Cir. 2007) (citation omitted). Summary judgment is appropriate if the record evidence shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) (citation omitted). "[R]easonable inferences are to be drawn in favor of the non-moving party." *Robinson*, 505 F.3d at 366 (citation omitted).

## III.

Section 905(b) permits a covered maritime employee to recover damages for personal injuries caused by the negligence of a vessel. 33 U.S.C. § 905(b). The parties agree that Patil is a covered employee under the LHWCA, because he was a "person engaged in maritime employment" at the time of the accident at issue. *See* 33 U.S.C. § 902(3). The scope of vessel

No. 21-30004

negligence under § 905(b) is limited to breach of the three narrow duties that shipowners owe to maritime employees, as outlined by the Supreme Court in *Scindia Steam*: (1) a "turnover duty," (2) a duty to exercise reasonable care to prevent injuries in the areas of the ship under the "active control of the vessel," and (3) a "duty to intervene" to prevent unsafe cargo operations. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98–101 (1994) (quoting *Scindia Steam*, 451 U.S. at 167–78).

On appeal, Patil argues that the district court erred in finding no genuine dispute as to any material fact with respect to his claims that Defendants breached their "turnover" and "active control" duties.[1]

A. Turnover Duty

"The turnover duty applies to the shipowner's obligation before or at the commencement of the [maritime employee's] activities[,]" and imposes two responsibilities on the vessel owner. *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 392 (5th Cir. 2008). First, the vessel owner must "exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert [maritime employee] can carry on [his] operations with reasonable safety." *Id.* (citing *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416–17 & n. 18 (1969)). Second, the vessel owner must "warn the [maritime employee] of latent or hidden dangers which are known to the vessel owner or should have been known to it;" however, a vessel owner has no duty to provide a warning for "open and obvious" dangers or "dangers a reasonably competent [maritime employee] should anticipate encountering." *Id.* (citing *Howlett*, 512 U.S. at 99–101).

---

[1] Patil does not appeal the district court's finding of no genuine dispute as to any material fact with respect to his "duty to intervene" claim.

The record reflects that the *Amber Lagoon* was turned over to Patil for ultrasonic testing in a reasonably safe condition based on Kedziora's testimony that crewmembers examined Patil's inspection areas for grease and cleaned the surfaces of the vessel's hatch covers before Patil's testing commenced. The record further indicates that any latent or hidden slip hazards were unknown to Defendants based on the crew's preparation efforts and Kedziora's testimony that he did not see any foreign substances in the area of the accident. Moreover, Patil, a surveyor with 45 years of experience in the maritime industry, reasonably should have anticipated encountering potential slip hazards in traversing the three-foot-wide, six-foot-tall gap between the port and starboard sides of Hold Four. The need for caution was particularly apparent in light of the fact that Patil was attempting this maneuver for the first time after consistently using the traditional—and safer—method of navigating between the two sides of each hold via the access ladders.

Significantly, the record lacks non-speculative evidence that the *Amber Lagoon* was turned over to Patil with any slip hazard—open, obvious, or otherwise—in the area of his accident. Both Patil and Kedziora testified that they did not actually observe a foreign substance at the site of the accident. In addition, shortly before the accident, Kedziora successfully jumped from the port side to the starboard side of Hold Four without slipping.

Patil's turnover duty claim is premised on an assumption that the later-discovered spot of grease on his work shoes came from the site of his accident and caused his slip-and-fall—despite the fact that neither Patil nor Kedziora observed grease in that area. In an unpublished opinion, we affirmed the district court's grant of summary judgment in favor of a vessel owner in a § 905(b) negligence action under similar allegations. *Kitchens v. Stolt Tankers B.V.*, 657 F. App'x 248, 249–52 (5th Cir. 2016) (per curiam).

The plaintiff in *Kitchens* slipped and fell on a vessel walkway and assumed that the accident was caused by an accumulation of vegetable oil or other foreign substances, however, neither the plaintiff nor any eyewitness actually observed a foreign substance on the walkway. *Id*. at 250–51. In light of the plaintiff's "failure to produce any evidence of a hazard on the walkway," we found that the plaintiff's assumption was "nothing more than unsupported speculation and therefore insufficient to defeat a motion for summary judgment." *Id*. at 252 (citing *Brown*, 337 F.3d at 541). Patil has similarly failed to present evidence of a slip hazard at the site of his accident, and his turnover claim rests on an unsupported assumption.

For these reasons, we find no genuine dispute as to any material fact with respect to Patil's turnover duty claim.

## B. Active Control Duty

Under the active control duty, a vessel may be liable under § 905(b) if it "actively involves itself in the cargo operations and negligently injures" a maritime employee, or if the vessel "fails to exercise due care to avoid exposing [the maritime employee] to harm from hazards [he] may encounter in areas, or from equipment, under the active control of the vessel" during his work operations. *Scindia Steam*, 451 U.S. at 167. Accordingly, "liability under the active control duty is premised on the presence or existence of a 'hazard' under the active control of the vessel." *Kitchens*, 657 F. App'x at 251 (quoting *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992)). Liability under the active control duty "is not relieved when the hazard is open and obvious." *Pimental*, 965 F.2d at 16 (citing *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 897 (5th Cir. 1989)). "If, however, a vessel has relinquished control over an area to the [maritime employee], then it is the primary responsibility of the [maritime employee] to remedy a hazard in that area." *Id*. (citation omitted).

8

Patil argues that Defendants breached the active control duty when (1) Defendants' cargo operations caused the port-side access ladder on Hold Four to become obstructed with cargo containers, thus forcing Patil to attempt the dangerous crossing that led to his slip-and-fall; and (2) Kedziora, Defendants' employee, took an active role in Patil's ultrasonic testing work and failed to ensure Patil's safe descent to the main deck.

Kedziora attested in a declaration that all cargo operations involving the *Amber Lagoon* (including all bulk cargo and all container loading, discharge, movement, placement and securing activities, as well as all crane operation necessary to conduct all such activities) were directed, controlled, and performed by an independent contractor stevedoring company and by that company's longshore crews. Kedziora further attested that the officers and crewmembers of the *Amber Lagoon* did not conduct, direct, supervise or control any such cargo, container, or crane activities and operations. Patil presented no evidence to refute Kedziora's attestations. Thus, the record reflects that Defendants had no active involvement over the *Amber Lagoon*'s cargo operations and did not exercise active control over the areas and equipment involved in those operations. *Scindia Steam*, 451 U.S. at 167.

Further, the record reflects that Defendants did not maintain active control over Patil's work, because Patil maintained full autonomy over the equipment used and areas examined during the testing period. There is no evidence that Kedziora set up or operated the ultrasonic testing equipment, directed Patil on how to use that equipment, or restricted Patil's freedom to move about the testing areas on the *Amber Lagoon* in the manner Patil saw fit. Instead, Kedziora merely followed Patil around, marked areas of leakage identified by Patil, and went to retrieve a piece of equipment from the inside of Hold Four at Patil's instruction after testing was complete. Indeed, the very reason Kedziora was not available to help Patil descend to the main deck was because Patil sent Kedziora ahead to retrieve the equipment. Thus, the

No. 21-30004

assistance Kedziora provided to Patil does not rise to the level of Defendants exercising active control over Patil's ultrasonic testing work. *Id.*

Even if Defendants had actively involved themselves in Patil's ultrasonic testing work, Patil's active control claim would still fail, because such a claim is premised on the existence of a hazard. *Kitchens*, 657 F. App'x at 251. As discussed above, Patil's "unsupported speculation" regarding the presence of grease at the site of his accident is insufficient to defeat a motion for summary judgment. *Id.* at 249–52.

For these reasons, we find no genuine dispute as to any material fact with respect to Patil's active control duty claim.

## IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.