# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 11, 2021

Lyle W. Cayce
Clerk

No. 19-20506

Gilbert Sanchez,

*Plaintiff—Appellant*,

*versus*

Smart Fabricators of Texas, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-00110

Before Owen, *Chief Judge*, Davis, Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.

W. Eugene Davis, *Circuit Judge*.

We took this case en banc to attempt to define for this Circuit a more definitive test, consistent with Supreme Court caselaw, to distinguish seamen entitled to benefits under the Jones Act from other maritime workers generally covered under the Longshore and Harbor Worker's Compensation Act.

We conclude that the plaintiff in this case, Gilbert Sanchez, a land-based welder directed by his employer to work on two discrete short-term transient repair jobs on two vessels, was not a seaman. Because Sanchez was not engaged in sea-based work that satisfied the requirement that he be substantially connected to a fleet of vessels in terms of the nature of his work, we AFFIRM the judgment of the district court.

## I. FACTUAL BACKGROUND

The material facts in this case are not in dispute. The plaintiff, Gilbert Sanchez,[1] was employed as a land-based welder by Smart Fabricators of Texas, LLC ("SmartFab"), a contract welding firm engaged in steel fabrication, repairs to drilling equipment, and general contract welding work. SmartFab's work is performed to meet the demands of its customers on land and sometimes on jack-up drilling barges. The issues in this case revolve around Sanchez's work for SmartFab on two jack-up barges owned by SmartFab's customer, Enterprise Offshore Drilling LLC ("Enterprise").

Sanchez worked for SmartFab for a total of 67 days between August 2017 and August 2018. Six of those days were spent working on welding jobs either on land or vessels that are irrelevant to his status as a seaman because they were not owned or controlled by Enterprise. Sanchez spent the remaining 61 days—those pertinent to our inquiry—on two different jack-up drilling rigs owned by Enterprise: the Enterprise WFD 350 and the Enterprise 263.

### A. Enterprise WFD 350

Sanchez worked on the Enterprise jack-up barge WFD 350 for 48 days doing welding work on a discrete repair job. The entire time he worked on this vessel, it was jacked-up so that the deck of the barge was level with

---

[1] Payroll records indicate that Sanchez worked for SmartFab using the name Jorge Cruz.

Gabby's Dock in Sabine Pass, Texas, and separated from the dock by a gangplank. Sanchez could take two steps on the gangplank, and he was ashore. He commuted from his home to the vessel daily. His time on the WFD 350 comprised approximately 72 percent of his total work time with SmartFab.

### B. Enterprise 263

Sanchez worked 13 days on one other Enterprise vessel, the Enterprise jack-up barge 263. His work on this vessel comprised approximately 19 percent of his time in SmartFab's employment. When Sanchez was dispatched to the Enterprise 263 in July 2018, it was located in West Cameron Block 38 on the Outer Continental Shelf ("OCS"). He was sent as part of a SmartFab crew that was contracted to perform repairs necessary to get the vessel in condition to satisfy requirements of the American Bureau of Shipping ("ABS"), the Bureau of Safety and Environmental Enforcement ("BSEE"), and the Coast Guard, so that the rig could begin drilling operations at a new drilling site on the OCS. Sanchez was aboard the rig when it was moved by tugboats to the new drilling location, South Timbalier Block 125 on the OCS.

Sanchez performed welding and related work on the deck of the Enterprise 263. On August 8, 2018, he fell and sustained the injury that is the subject of this suit. Because Sanchez was sent ashore on August 9, 2018, following his injury, he was unable to complete his assignment and remain with the SmartFab crew until the repairs were completed on August 10, 2018. The rig began drilling on August 11, 2018.[2] Sanchez left the employ of

---

[2] Counsel for Sanchez confirmed during oral argument that the SmartFab work was completed on August 10 and drilling began on August 11, 2018 (Oral Argument Recording at 15:33-15:39), which is consistent with the affidavit of Glen Whitman, Rig Manager of the Enterprise 263.

SmartFab after his injury and, as far as the record shows, did no more work on Enterprise vessels.

## II. PROCEDURAL HISTORY

After his accident, Sanchez sued SmartFab in state court under the Jones Act. SmartFab promptly removed the case, but Sanchez moved to remand, arguing that the Jones Act precluded removal. The district court denied Sanchez's motion to remand and granted SmartFab's motion for summary judgment, both for the same reason: Sanchez did not qualify as a Jones Act seaman.[3]

### A. District Court Rulings

The district court concluded that Sanchez failed to establish a substantial connection in terms of the nature of his work to the Enterprise fleet of jack-up barges he worked aboard.[4] The district court held that Sanchez spent more than 30 percent of his work time with SmartFab working on the Enterprise WFD 350 and 263, and that his repair work on those barges contributed to the function of these vessels.[5] Because he contributed to the function of the vessels, he satisfied prong one of the seaman-status test.[6] The court also held that because Sanchez spent more than 30 percent of his work time with SmartFab working on those two barges, he met the substantial connection requirement as to duration.[7] However, the district court concluded that because less than 30 percent of his work on the two vessels

---

[3] *See Sanchez v. Enter. Offshore Drilling LLC*, No. CV H-19-110, 2019 WL 2515307, at *4 (S.D. Tex. June 18, 2019); *Sanchez v. Enter. Offshore Drilling LLC*, 376 F. Supp. 3d 726, 733 (S.D. Tex. 2019).

[4] *Sanchez*, 376 F. Supp. 3d at 732.

[5] *Id.*

[6] *Id.*

[7] *Id.*

was performed away from the dock, he did not satisfy the nature element of the substantiality requirement and therefore Sanchez was not a seaman.[8] For this reason, the district court denied Sanchez's motion to remand the case to state court.[9] For the same reason, the district court granted SmartFab's motion for summary judgment.[10] Sanchez timely appealed both rulings.

### B. Panel Opinion and En Banc Review

On appeal, the panel originally held that based upon binding Circuit precedent, Sanchez satisfied the requirements for seaman status. We based this on two of our earlier cases: *In re Endeavor Marine, Inc.*,[11] and *Naquin v. Elevating Boats, L.L.C.*[12] One member of the panel filed a concurring opinion, joined by the other members of the panel, questioning whether our precedent was in line with Supreme Court caselaw and proposing that we take the case

---

[8] *Id.*

[9] *Id.* at 733.

[10] *Sanchez*, 2019 WL 2515307, at *3–4.

[11] 234 F.3d 287 (5th Cir. 2000) (per curiam).

[12] 744 F.3d 927 (5th Cir. 2014). Most of the scholarship discussing our two earlier cases is critical of our holdings. *See* Kenneth G. Engerrand, *Escape from the Labyrinth: Call for the Admiralty Judges of the Supreme Court to Reconsider Seaman Status*, 40 HOUS. J. INT. L. 741, 763–74, 795 (2018); Timothy M. O'Hara, Comment, Naquin v. Elevating Boats, LLC: *The Fifth Circuit's Improper Expansion of Jones Act "Seaman Status" Qualification*, 36 PACE L. REV. 263, 286 (2015); Matthew H. Frederick, Note, *Adrift in the Harbor: Ambiguous-Amphibious Controversies and Seamen's Access to Workers' Compensation Benefits*, 81 TEX. L. REV. 1671, 1705 (2003); L. Taylor Coley, Note, *The "Perils of the Sea"- Man Status Question: The Fifth Circuit Falls Behind FELA's Advancements in Remedies in Favor of the Continued Confusion Surrounding the Seaman Definition*, 39 TUL. MAR. L. J. 371, 380–81 (2014). *But see* John R. Hillsman, *Still Lost in the Labyrinth: The Continuing Puzzle of Seaman Status*, 15 U.S.F. MAR. L. J. 49, 73–75 (2003). For a general discussion of these cases, see 1 Robert Force & Martin J. Norris, *The Law of Seamen* § 2:8 Westlaw (database updated Nov. 2020).

en banc to consider this question.[13] The case was voted en banc, and, for the reasons set forth below, the en banc court agrees that Supreme Court precedent requires us to affirm the judgment of the district court.

## III.  APPLICABLE LAW

We review both the denial of a motion to remand and the grant of summary judgment de novo.[14]

### A.  Jones Act and LHWCA

The Jones Act grants "a seaman" a cause of action against his employer in negligence.[15] Only seamen may sue under the Jones Act and Jones Act claims are "not subject to removal to federal court."[16] Sanchez argues that because he was a seaman who brought his negligence action under the Jones Act in state court, the district court erred both in denying his motion to remand and in granting summary judgment for SmartFab. So, the only issue for us to decide to resolve this appeal is whether Sanchez is a seaman (or entitled to have a jury resolve the issue) entitled to the benefits of the Jones Act.

---

[13] *Sanchez v. Smart Fabricators of Texas, L.L.C.*, 970 F.3d 550, 555–56 (5th Cir.), *reh'g en banc granted, opinion vacated*, 978 F.3d 976 (5th Cir. 2020).

[14] *Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 445 (5th Cir. 2006), *abrogated on other grounds by Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115 (2013).

[15] "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section." 46 U.S.C. § 30104.

[16] *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 455 (2001) (noting that 28 U.S.C. § 1445(a), which bars removal of certain suits involving railroads, is incorporated into the Jones Act).

In addition to the Jones Act, another important statute is relevant to our inquiry. Congress enacted the Longshore and Harbor Worker's Compensation Act (LHWCA) in 1927 to establish a federal compensation remedy for injuries to certain land-based workers occurring on navigable waters.[17] Generally, coverage under this compensation act excluded from its coverage "a master or member of a crew of any vessel."[18] The LHWCA, therefore, limits the definition of "seaman" in the Jones Act so as "to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters and to substitute for the right of recovery . . . only such rights to compensation as are given by the LHWCA."[19] Thus, the seaman's remedy is limited to rights granted by the Jones Act, and rights granted to other maritime workers are provided exclusively by the LHWCA. The two remedies are mutually exclusive.[20]

Because Congress has not defined the term "seaman," the definition of and distinction between the two groups have been the subject of extensive litigation, and courts have struggled to establish workable tests to define the word "seaman."

---

[17] 33 U.S.C. § 903(a).

[18] 33 U.S.C. § 902(3)(G).

[19] *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 347 (1991) (quoting *Swanson v. Mora Brothers, Inc.*, 328 U.S. 1, 7 (1946)).

[20] *See id.*

## B. Supreme Court Trilogy

In the 1990s, the Supreme Court decided three cases that were enormously helpful in giving meaning to the term "seaman."

### 1. *Wilander*

First was *McDermott International, Inc. v. Wilander*.[21] The Court took this case primarily to resolve a split among the circuits on the question of whether a plaintiff, to establish seaman status, was required to show that he aided in the navigation of a vessel.[22] The Court rejected the circuit cases imposing this requirement and adopted the test set forth in Judge Wisdom's landmark decision in *Offshore Co. v. Robison*, requiring proof that the seaman "contributed to the function of the vessel or to the accomplishment of its mission" and have an employment-related connection to a vessel.[23] The *Wilander* Court emphasized, "The key to seaman status is employment-related connection to a vessel in navigation."[24]

In order to give effect to the land-based/sea-based distinction, the Court "believe[d] the better rule is to define 'master or member of a crew' under the LHWCA, and therefore 'seaman' under the Jones Act, solely in terms of the employee's connection to a vessel in navigation."[25] The Court was persuaded that the connection requirement was consistent with "Congress' land-based/sea-based distinction," explaining: "All who work

---

[21] 498 U.S. 337 (1991).

[22] *Id.* at 340.

[23] 266 F.2d 769, 779 (5th Cir. 1959).

[24] *Wilander*, 498 U.S. at 355.

[25] *Id.* at 354.

at sea in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed."[26]

### 2. *Chandris*

The Supreme Court's next decision on seaman status came four years later in *Chandris, Inc. v. Latsis.*[27] In this case, the plaintiff, Latsis, was a supervising engineer who oversaw an engineering department for a fleet of six passenger cruise ships.[28] Latsis developed a detached retina while sailing on one of the vessels and sued because of an alleged delay by the employer in providing medical care.[29] Latsis's duties required him to divide his work between the office and aboard ship when he sometimes sailed for inspection and supervision of engineering work.[30] The Court was therefore asked to define the "relationship a worker must have to the vessel, regardless of the specific tasks the worker undertakes in order to obtain seaman status."[31] After discussing the judicial and legislative history of the passage of the LHWCA, the *Chandris* Court stated: "With the passage of the LHWCA, Congress established a clear distinction between land-based and sea-based maritime workers. The latter who owe their allegiance to a vessel and not solely to a land-based employer, are seamen."[32] The Court also pointed out that Congress, by enacting the LHWCA, had twice overturned the Supreme Court's extension of seamen's remedies to other maritime workers doing

---

[26] *Id.*

[27] 515 U.S. 347 (1995).

[28] *Id.* at 350.

[29] *Id.* at 350–51.

[30] *Id.* at 350.

[31] *Id.*

[32] *Id.* at 359.

seamen's work and incurring seamen's hazards.[33] Justice O'Connor summed up the effect of these two congressional acts: "Whether under the Jones Act or general maritime law, seamen do not include land-based workers."[34]

In explaining the importance of the requirement that a seaman have a substantial, enduring relationship to a vessel, the Court rejected a snapshot test for seaman status, denouncing a test that inspected "only the situation as it exists at the instance of injury" and noting that "a more enduring relationship is contemplated in the jurisprudence."[35] The Court emphasized that "a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured."[36] The Court also recognized that "[s]eaman status is not co-extensive with seamen's risk."[37] "Some workers who unmistakably confront the perils of the sea, often in extreme form, are thereby left out of the seamen's protections."[38]

The Court then turned to apply these principles to the sufficiency of plaintiff's relationship to his employer's fleet of vessels to qualify for seaman status. It defined the substantial-connection test with two elements: "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its

---

[33] *Id.*

[34] *Id.* at 358.

[35] *Id.* at 363.

[36] *Id.*

[37] *Id.* at 361.

[38] *Id.* at 362. For example, Mississippi River pilots who do nothing but pilot ocean-going vessels through dangerous sections of the river are not seaman because the ships have no common ownership or control. *See Bach v. Trident S.S. Co., Inc.*, 947 F.3d 1290 (5th Cir. 1991).

nature."[39] In discussing the duration element, the Court stated that "the total circumstances of an individual's employment must be weighed."[40] The *Chandris* Court approved our rule of thumb as a guide to the degree of permanence required to satisfy the duration element. "A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."[41]

Because the record was unclear regarding how much of plaintiff's time was spent working on the employer's vessels as opposed to his land-based work, the Court remanded the case for application of the stated principles to the facts.[42]

### 3. *Papai*

The Supreme Court provided more guidance on the nature element of the substantiality requirement in *Harbor Tug and Barge Co. v. Papai* – the third case in this trilogy.[43] This case is closely analogous to the facts of the present case. In *Papai*, the shipowner, Harbor Tug, was one of several tugboat operators operating in San Francisco Bay that obtained workers through a union hiring hall.[44] Papai was engaged through the union hall to paint the housing of a Harbor Tug, the Pt. Barrow.[45] The entire time Papai worked on the Pt. Barrow, it was located dockside.[46]

---

[39] *Chandris*, 515 U.S. at 368.

[40] *Id.* at 370 (quoting *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 432 (5th Cir. 1984)).

[41] *Id.* at 371.

[42] *Id.* at 374–75.

[43] 520 U.S. 548 (1997).

[44] *Id.* at 551.

[45] *Id.*

[46] *Id.* at 559.

The Court stated that "[f]or the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea."[47] It further explained that "[t]his will give substance to the inquiry both as to duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees."[48] The Court then considered Papai's actual duties and whether they satisfied the nature element. It determined, "[h]is actual duty on the Pt. Barrow throughout the employment did not include any seagoing activity; he was hired for one day to paint the vessel at dockside and he was not going to sail with the vessel after he finished painting it."[49]

Papai contended that the entire group of vessels he worked on through the union hiring hall constituted an identifiable group of vessels and his connection to this "fleet" should be considered.[50] The Supreme Court rejected such a broad definition of "fleet." The Court stated: "In deciding whether there is an identifiable group of vessels of relevance for a Jones Act seaman-status determination, the question is whether the vessels are subject to common ownership or control."[51]

Papai then also argued that he qualified as a seaman if his jobs over the past two and a half months working on Harbor Tug's vessels were considered.[52] The Court answered,

---

[47] *Id.* at 555.

[48] *Id.*

[49] *Id.* at 559.

[50] *Id.* at 555.

[51] *Id.* at 557.

[52] *Id.* at 559.

Papai testified at his deposition that he worked aboard the Pt. Barrow on three or four occasions before the day he was injured, the most recent of which was more than a week earlier. Each of these engagements involved only maintenance work while the tug was docked. The nature of Papai's connection to the Pt. Barrow was no more substantial for seaman-status purposes by virtue of these engagements than the one during which he was injured . . . . In any event these discrete engagements were separate from the one in question, which was the sort of "transitory or sporadic" connection to a vessel or a group of vessels that, as we had explained in *Chandris*, does not qualify one for seaman status.[53]

---

[53] *Id.* at 559–60. The Second Circuit applied the previous Supreme Court cases to determine whether a maritime worker had a substantial connection in terms of duration and nature to satisfy the test for seaman's status in *Matter of Buchanan Marine, L.P.*, 874 F.3d 356 (2d Cir. 2017). In that case, the plaintiff, Volk, worked at a quarried rock processing facility on the Hudson River, inspecting and maintaining barges used to transport rock down the river. *Id.* at 360. Volk was injured when he slipped from the narrow deck of one of the barges and sustained injuries. *Id.* The Second Circuit concluded that as a matter of law, Volk did not qualify as a seaman under the Jones Act. *Id.* at 368. The court held that Volk "did not derive his livelihood from sea-based activities" and "Volk never operated a barge and only worked aboard the barges when they were secured to the dock." *Id.* at 366 (internal quotation marks and citation omitted).

The Ninth Circuit applied the same Supreme Court cases in *Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289 (9th Cir. 1997) to determine whether a barge-crane operator had a substantial connection in terms of duration and nature in order to be a seaman. The plaintiff crane operator was working in a quiet harbor with limited movement of the crane barge. *Id.* at 1293. Notably, the plaintiff was assigned to the barge for a specific project, and no evidence was presented that he would continue to work on the barge after the project was completed. *Id.* The Ninth Circuit concluded that the crane operator was not a seaman because he was "a land-based crane operator who happened to be assigned to a project which required him to work aboard [a crane barge]." *Id.*

In *Delange v. Dutra Const. Co., Inc.*, 183 F.3d 916, 920 (9th Cir. 1999), the Ninth Circuit concluded that a reasonable juror could find that the plaintiff carpenter was a seaman. Although the plaintiff's job as a carpenter was a land-based trade, the facts in the record

## C. Fifth Circuit Precedent

As stated above, the panel concluded that based on two of our cases, *Endeavor Marine* and *Naquin*, it was bound to hold that Sanchez was entitled to proceed with his Jones Act suit as a seaman.[54] The panel in a unanimous concurring opinion, however, concluded that those two cases were probably not consistent with the Supreme Court cases discussed above, namely *Wilander*, *Chandris* and *Papai*, and urged this Court to take the case en banc so that we could reconsider our circuit law on this question.[55]

In *Naquin*, the plaintiff, a vessel repair supervisor, was injured in a shipyard while working on a fleet of lift boats.[56] The lift boats he worked on were either moored, jacked-up, or docked in the shipyard canal.[57] We rejected the argument that this work did not expose the plaintiff to the perils of the sea and permitted him to pursue his suit under the Jones Act.[58] Because all of Naquin's work was performed on or near the dock, and we erred in analyzing *Naquin* based solely on the "perils of the sea" test, we must overrule it.

In *Endeavor Marine*, the plaintiff, a crane operator, was assigned to work aboard a derrick barge on the Mississippi River that was usually moored to the dock, where he loaded and unloaded cargo and helped to maintain the

---

indicated that carpentry comprised only ten percent of the plaintiff's work. *Id.* The rest of the plaintiff's work "involved crewman and deckhand duties" where he was a lookout, cargo stower, line handler, and occasional pilot on a construction barge that moved to various construction sites. *Id.* Thus, facts clearly indicated that the plaintiff was a sea-based worker who did not have a "transitory or sporadic" connection to the vessel.

[54] *Sanchez*, 970 F.3d at 555.

[55] *Id.* at 555–56.

[56] 744 F.3d 927, 931 (5th Cir. 2014).

[57] *Id.* at 930.

[58] *Id.* at 935.

crane.[59] Sometimes, the barge was moved from its base wharf to other wharfs for loading and unloading ships. On at least one occasion during the 18 months he worked on the barge, the plaintiff rode the barge from one location to another to operate and perform maintenance on the crane.[60] On other occasions, he drove his automobile to the new location where the barge was moved.[61] We reversed the district court and held that because the plaintiff was exposed to the perils of the sea, he was a seaman.[62]

Based on the fact that (1) plaintiff was permanently assigned to and worked on the same barge during his entire employment, (2) the barge was moved on occasion to different wharfs on the Mississippi River and the plaintiff moved to whatever new location the vessel was moved to, we cannot say the *Endeavor Marine* panel erred in holding the plaintiff was a seaman. However, as we explain below, we do not endorse the panel's rationale.

The panels in *Endeavor Marine* and *Naquin* asked whether those plaintiffs were subject to the "perils of the sea" as the primary test of their satisfaction of the nature element.[63] While this is one of the considerations in the calculus, it is not the sole or even the primary test.

---

[59] 234 F.3d 287, 289 (5th Cir. 2000).

[60] *In re Complaint of Endeavor Marine, Inc.*, No. CIV.A. 98-0779, 1999 WL 76586, at *4 (E.D. La. Feb. 11, 1999).

[61] *Id.* at *1.

[62] *Endeavor Marine*, 234 F.3d at 292.

[63] Much of the scholarship addressing seaman status emphasizes that "perils of the sea" alone is a problematic test for making the land-based and sea-based distinction. *See, e.g.*, Matthew H. Frederick, Note, *Adrift in the Harbor: Ambiguous-Amphibious Controversies and Seamen's Access to Workers' Compensation Benefits*, 81 TEX. L. REV. 1671, 1704 (2003).

### D. Distilling the Principles from the Supreme Court Trilogy

In *Chandris*, the Court made clear that seamen and non-seamen maritime workers may face similar risks and perils, and that this is not an adequate test for distinguishing between the two.[64] We therefore conclude that the following additional inquiries should be made:

(1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?[65]

(2) Is the work sea-based or involve seagoing activity?

(3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

Simply asking whether the worker was subject to the "perils of the sea" is not enough to resolve the nature element. Consider the captain and crew of a ferry boat or of an inland tug working in a calm river or bay, or the drilling crew on a drilling barge working in a quiet canal. No one would question whether those workers are seamen. Yet, their risk from the perils of the sea is minimal. Considering the more definitive inquiries set forth above by the Supreme Court, we now examine whether Sanchez was a seaman under the Jones Act during his employment with SmartFab.

---

[64] *See Chandris v. Latsis*, 515 U.S. 347, 361–62 (1991).

[65] *See id.* at 359 (citing *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 347 (1991)) ("Congress established a clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen.").

## IV. DISCUSSION

As indicated above, Sanchez worked on two vessels during his 67 days of employment with SmartFab that are relevant to his seaman status. He worked aboard the Enterprise WFD 350 for 48 of his 67 days and 13 days aboard the Enterprise 263. His entire time aboard these two vessels was spent doing discrete welding jobs as part of repairs to the two vessels. This work certainly contributed to the function of these two vessels because that work was necessary to keep the vessels in condition to drill for oil and gas. Thus, Sanchez satisfied the first prong of the seaman-status test.[66]

Sanchez spent approximately 90 percent of his total employment time with SmartFab aboard the two Enterprise vessels. He therefore satisfied the duration prong of the substantiality test. As the Court stated in *Chandris*, generally if a worker spends at least 30 percent of his time aboard a vessel or a fleet of vessels, then he establishes the duration prong. The question narrows to determine whether Sanchez spent at least 30 percent of his time aboard these two vessels doing work that satisfies the nature prong of that test.

As to the work Sanchez did aboard the WFD 350, the Supreme Court's decision in *Papai* makes it clear that this work was not "sea-based" and therefore did not satisfy the nature test. All of Sanchez's work on that

---

[66] While Sanchez was working aboard the Enterprise WFD 350 and Enterprise 263, both vessels were "in navigation" as that term has been defined by the Supreme Court. *See Chandris*, 515 U.S. at 374 (noting that a vessel is "in navigation" even though "moored to a dock, if it remains in readiness for another voyage" and recognizing general rule that "vessels undergoing repairs or spending relatively short period of time in drydock are still considered to be 'in navigation'") (internal quotation marks and citations omitted); *see also Stewart v. Dutra Const. Co.*, 543 U.S. 481, 495 (2005) (noting that "in navigation" requirement is "relevant to whether the craft is 'used, or capable of being used' for maritime transportation"); 1 Robert Force & Martin J. Norris, *The Law of Seamen* § 2:18 Westlaw (database updated Nov. 2020); 1B *Benedict on Admiralty* § 11b (2020).

vessel was performed while it was jacked-up with the barge deck level with the dock and a gangplank away from shore. Just as Papai's actual duties on the Pt. Barrow moored at the dock did not include any "seagoing activity," neither did Sanchez's work on the WFD 350. The *Papai* Court explicitly stated that "maintenance work while the tug was docked" did not satisfy the nature test.[67] The Court also found significant the fact that there was no reason to assume that any particular percentage of Papai's work would be of a "seagoing nature" subjecting him to the "perils of the sea."[68] The *Papai* Court also found significant that Papai's "actual duty on the Pt. Barrow throughout the employment in question did not include any seagoing activity; he was hired for one day to paint the vessel at dockside, and he was not going to sail with the vessel after he finished painting it."[69]

It is clear from the above Supreme Court cases, that Sanchez, like Papai, who was working on a vessel at the dock, was not engaged in "seagoing activity." His duties on the WFD 350 did not "take him to sea;" his work on the docked vessel was not "of a seagoing nature;" and after he finished his

---

[67] *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 559 (1997).

[68] *Id.* at 560.

[69] *Id.* at 559. Sanchez argued that *Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81 (1991) supports his view that as a ship repairman, he should be considered a seaman. We disagree. The Court granted review in that case to consider whether a ship repairman is ineligible for seaman status because "ship repairmen" is one of the enumerated occupations under the term "employee" as defined in the LHWCA. The Court, without considering the merits of the plaintiff's claim to seaman status, stated: "While in some cases a ship repairman may lack the requisite connection to a vessel in navigation to qualify for seaman status, not all ship repairmen lack the requisite connection as a matter of law. This is so because '[i]t is not the employee's particular job that is determinative, but the employee's connection to a vessel." *Gizoni*, 502 U.S. at 492 (citations and footnote omitted). Therefore, Sanchez is clearly not barred from obtaining coverage under the Jones Act as a seaman simply because he was a ship repairer. If he could establish the requisite connection to the Enterprise fleet, he would be entitled to that protection. We hold he is not entitled to that protection because he failed to establish that required connection.

work at the dock, "he was not going to sail with the vessel" after he finished his work.

With respect to Sanchez's work on the Enterprise 263, the record reveals that he reported to that vessel located in the Gulf of Mexico on the OCS in July 2018, as part of a SmartFab crew engaged to make discrete repairs on the vessel for a specific reason: to satisfy requirements of the ABS, BSEE, and Coast Guard, so that the rig could begin drilling at a new location on the OCS. It is undisputed that Sanchez worked for 13 days on the Enterprise 263 and that he was injured when he fell on the deck of the rig on August 8, 2018. After his injury, Sanchez was sent ashore for medical assistance.

The remainder of the SmartFab crew worked until August 10 or 11, 2018, when the repairs SmartFab agreed to perform were completed. The vessel began drilling on August 11, 2018, as planned at the new location.[70] No evidence was presented that Sanchez planned to remain after the SmartFab crew completed their job, and there is no suggestion of any reason he would plan to do that.

Sanchez worked on the Enterprise 263 only 13 days, which would amount to less than 20 percent of his total time of his employment with SmartFab – well short of the 30 percent required for satisfaction of the duration prong of the substantiality test. Sanchez's work on the Enterprise 263, even though it was located on the OCS, was work performed on a discrete, individual job. When he and the SmartFab crew were finished, Sanchez would have no further connection to the vessel.

---

[70] As previously noted, Counsel for Sanchez confirmed during oral argument that the SmartFab work was completed on August 10 and drilling began on August 11, 2018.

Our case law reveals generally that two types of workers are found on drilling rigs. First, we have the drilling crew, who conduct the drilling operations (and workers who support that activity) and stay with the vessel when it moves from one drilling location to another.[71] These workers are the members of the crew of the vessel and are seamen. The second group are specialized transient workers, usually employed by contractors. These workers are engaged to do specific discrete short-term jobs.[72] Discrete transient jobs are like the work done by longshoremen when a vessel calls in port. As stated in *Papai*, these workers have only a "transitory or sporadic" connection to a vessel or group of vessels and do not qualify for seaman status.[73] Sanchez, as a transitory worker, falls into the second group, and thus does not satisfy the nature test.

---

[71] *See Offshore Co. v. Robison*, 266 F.2d 769, 771–72 (5th Cir. 1959) (holding that an oilfield worker was a member of the crew that remained aboard the rig when it was moved to different well locations was a seaman); *Rogers v. Gracey-Hellums Corp.*, 331 F. Supp. 1287, 1288 (E.D. La. 1970), *aff'd*, 442 F.2d 1196 (finding that a roughneck permanently attached to a barge was a member of the crew); *Producers Drilling Co. v. Gray*, 361 F.2d 432, 436–37 (5th Cir. 1966) (finding that a roustabout who maintained a barge and its equipment as well as helped drill a well was a seaman).

[72] *See, e.g., Lirette v. N.L. Sperry Sun, Inc.*, 831 F.2d 554, 557 (5th Cir. 1987) (holding that a wireline worker was a "transitory maritime worker" and not a seaman). Lirette was a land-based wireline operator who performed "one specialized job for many different vessels." *Id.* We stated: "His duties closely resembled those of a transitory maritime worker. As we stated in *Barrett*, the distinction between seamen and transitory workers may not be blurred." *Id. See also Roberts v. Cardinal Serv., Inc.*, 266 F.3d 368, 378 (5th Cir. 2001) (discussing that a plugging and abandonment worker injured by a perforation gun attached to a wireline was not a seaman); *Ardleigh v. Schlumberger Ltd.*, 832 F.2d 933, 934 (5th Cir. 1987) ("[I]tinerant wireline workers are not Jones Act seamen."); *Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 538–39 (5th Cir. 2015) (holding that a welder was not a seaman because he was only assigned for one specific project which had a clear two month end date). *See also* 1B *Benedict on Admiralty* § 11e (2020) (collecting cases in Table 4).

[73] *Papai*, 520 U.S. at 559–60.

## V. CONCLUSION

We conclude that Sanchez failed to create a genuine issue of material fact that he had a substantial connection to the Enterprise fleet of vessels as it related to the nature of his work. We therefore agree with the district court that Sanchez failed to meet the requirements for seaman status, and we AFFIRM the judgment of the district court.

James L. Dennis, *Circuit Judge*, concurring:

I concur in the majority opinion because it decides the present case consistently with the Supreme Court's decisions in *McDermott International, Inc. v. Wilander*, 498 U.S. 337 (1991), *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), and *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548 (1997). I write to note that in future, perhaps more challenging, cases concerning contours of the Jones Act's coverage of maritime workers, I would look, in addition to the majority's authorities and reasoning, to the enduring writings of the late Professor David W. Robertson, a leading scholar and practitioner of maritime law.[1] As the majority endeavors to do here, in his article, *The Supreme Court's Approach to Determining Seaman Status: Discerning the Law Amid Loose Language and Catchphrases*, Prof. Robertson "provides a template for translating the U. S. Supreme Court's controlling seaman status cases" under the Jones Act. 34 J. Mar. L. & Com. 547, 548 (2003). This article remains, in my view, a pinnacle of scholarship synthesizing the Court's jurisprudence on the seaman status issue and serves as a useful guide for future cases.

---

[1] In addition to benefitting over the years from Prof. Robertson's outstanding body of scholarship on maritime and tort law, I also consider myself fortunate to have counted Prof. Robertson as a friend dating back to our service together on the Louisiana Law Review. I was indeed lucky to have David serve as my first student editor.