# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 17-30007

————

United States Court of Appeals
Fif h Circuit

**FILED**

December 18, 2017

Lyle W. Cayce
Clerk

MANSON GULF, L.L.C,

      Plaintiff

v

MODERN AMERICAN RECYCLING SERVICE, INCORPORATED

      Defendant

--------------------------------------------------------------------------------

In re: In the Matter of Complaint of Manson Gulf, L.L.C., as Bareboat Charterer of the Barge Marmac 262, for Exoneration from or Limitation of Liability

MANSON GULF, L.L.C., as bareboat charterer of the barge Marmac 262,

      Petitioner - Appellee

v.

JAMES LAFLEUR, Estate of; ANGIE LAFLEUR, Widow of James LaFleur and on behalf of minor children L.L., D.L., and B.L.,

      Claimants - Appellants

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

REAVLEY, Circuit Judge:

Longshoreman James "J.J." LaFleur fell 50 feet to his death after stepping through a hole in a decommissioned oil platform. The platform sat atop a barge chartered by Manson Gulf, L.L.C., who ordered the hole's creation but did not cover the hole or warn J.J. of its existence.

J.J.'s spouse alleged negligence on the part of Manson and sought damages. The district court, however, granted summary judgment for Manson, finding no liability under any of the three *Scindia* duties—the duties a vessel owner owes to a longshoreman. Because we conclude a fact issue precluded summary judgment with respect to the duty to warn of hidden dangers, we reverse.

## I. BACKGROUND

Manson Gulf, L.L.C. is in the business of decommissioning oil-drilling platforms in the Gulf of Mexico. In 2015, Manson acquired one such platform, the BA A-23-A, from Freeport-McMoRan Oil & Gas. Manson extracted the 50-foot-tall, four-leg platform and placed the structure on a chartered barge. To lift the structure, Manson ordered four holes cut in the platform's grating adjacent to each of the support legs. Rigging chains could then be passed through the holes and around the legs to take hold of the platform. Each hole was approximately two feet by two feet. Manson left the holes uncovered and unmarked.

2

No. 17-30007

Modern American Recycling Service (MARS) is in the business of dismantling steel structures and selling the metal for scrap. MARS agreed to purchase and scrap the BA A-23-A platform, and Manson delivered the structure to MARS's dock, located on Bayou Black, Louisiana.

On the morning of June 16, 2015, a Manson project engineer, Dustin Clement, warned MARS of oil in the platform's pipes but not of the unmarked holes. Afterwards, Clement left MARS's dock and no Manson personnel remained. Jeff Smith, a MARS foreman in charge of riggers and cutters, then boarded the platform (still atop the barge) to locate the presence of oil. After Smith investigated for ten minutes, J.J. LaFleur joined Smith aboard the platform to lend a hand. J.J. was an independent contractor, employed by MARS to take inventories, do inspections, and perform other miscellaneous tasks.

As Smith and J.J. walked across the platform, they discussed the oil dilemma and looked at the pipes that ran overhead. While turning, J.J. stepped through an unmarked hole. Smith, then eight feet behind, attempted to intervene, but it was too late—J.J. fell 50 feet to the barge's deck and died from his injuries. Pictures of the structure and hole in the grating are attached. *See* Appendix, figs. 1–3.

Following J.J.'s death, Manson filed a complaint seeking exoneration or limitation from liability. MARS answered the complaint and asserted various claims and defenses. And Angie LaFleur, J.J.'s surviving spouse, filed claims for damages against Manson and MARS, alleging negligence under both maritime and Louisiana law. Manson and MARS then moved for summary judgment, and the district court granted both parties' motions, finding neither liable under § 905 of the Longshore and Harbor Workers' Compensation Act (LHWCA). The LaFleur claimants appealed only from the summary judgment with respect to Manson.

No. 17-30007

## II.    DISCUSSION

### A. Standard of Review

We review a "district court's grant of summary judgment *de novo* applying the same standards as the district court." *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The decision-making process is tweaked slightly when the case is to be tried before the court and not a jury. *See Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978). In that circumstance, "the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though [the] decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Id.* However, the court may exercise this inference-drawing function only when "the evidentiary facts are not disputed" and "there are no issues of witness credibility." *Id.*

### B. The *Scindia* Duties

Section 905(b) of the LHWCA governs the present suit and supplies the relevant tort-based duties owed by vessel owners to longshoremen. 33 U.S.C. § 905(b); *see also Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008). Decades ago, those duties were open-ended, premised in part on a nondelegable warranty of seaworthiness that required no proof of fault. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 164 (1981). But following the 1972 amendment to § 905(b), the Supreme Court clarified in *Scindia* that vessel-owner liability sounds only in negligence. *Id.* at 165. To that end, *Scindia* articulated three "narrow duties" owed by the vessel owner: "(1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship

4

under the active control of the vessel, and (3) a duty to intervene." *Kirksey*, 535 F.3d at 391.

The turnover duty encompasses two distinct-but-related obligations. First, the vessel owner "owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety." *Id.* at 392. And second, the vessel owner "owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it." *Id.* However, a vessel owner need not warn of "dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." *Id.*

The active control duty requires that the vessel owner "exercise due care to avoid exposing longshoremen to harm from hazards that they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167.

Finally, the duty to intervene imposes liability "if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazards and that the stevedore, in the exercise of 'obviously improvident' judgment means to work on in the face of it and therefore cannot be relied on to remedy it." *Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 (5th Cir. 1995) (quoting *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 15 (5th Cir. 1992)).

## C. The Active Control Duty and the Duty to Intervene

As a preliminary matter, we agree with the district court that neither the active control duty nor the duty to intervene apply to this case. Both liability theories fail for the same reason: it is undisputed that all Manson personnel departed the barge prior to J.J.'s fall.

Though the mere presence of vessel employees is not necessarily indicative of active control, we have twice cited the complete *absence* of such

personnel as evidence of the opposite—a lack of vessel control. *See Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir. 1996); *Burchett*, 48 F.3d at 179. The LaFleur claimants point to testimony that Manson had not yet transferred ownership of the platform when J.J. fell. But our cases speak in terms of control, not legal ownership.[1] Without evidence that Manson continued to exercise control over the platform, liability cannot rest on the second *Scindia* duty.

As for the duty to intervene, the absence of Manson personnel is similarly dispositive. Assuming Manson had actual knowledge of the hole, the LaFleur claimants still needed to prove Manson had actual knowledge of "obviously improvident judgment" on the part of MARS (the stevedore). *Burchett*, 48 F.3d at 178. Because no Manson personnel remained when Smith and J.J. boarded the platform, the LaFleur claimants offered no evidence that Manson observed MARS employees interacting with the hazard, let alone in an obviously improvident manner. *See id.* (affirming summary judgment on the duty-to-intervene issue because the vessel owner "had no personnel present at the job site who could have had knowledge of any peculiar dangers related to [the stevedore's] operations"). As a consequence, the duty to intervene is inapplicable.

## D. The Turnover Duty

We disagree, however, with the district court's decision to grant summary judgment with respect to Manson's turnover duty. The parties frame the turnover duty in terms of the duty-to-warn component, several elements of which are undisputed. First, the hole was, needless to say, a "danger"—it was

---

[1] Indeed, if mere ownership of a hazardous condition was sufficient to create control, would not every vessel owner automatically control hazards appurtenant to its vessel? Our cases say otherwise. *See, e.g.*, *Fontenot*, 89 F.3d at 208 (a vessel's hatch cover was not under the vessel owner's control).

at such a height to make death or grievous injury a near certainty for anyone who fell through it. Second, Manson had actual knowledge of the hole, or is at least charged with knowledge, because Manson orchestrated the cutting before delivering the platform. *See Hernandez v. M/V Rajaan*, 841 F.2d 582, 586 (5th Cir. 1988) ("If the condition existed from the outset, the shipowner is charged with actual knowledge of the dangerous condition . . . ."). And finally, Manson warned MARS only of explosive fluids, not holes.

Therefore, the validity of the LaFleur claimants' turnover-duty claim hinges on whether the hole was hidden or was instead (1) open and obvious or (2) a danger "a reasonably competent stevedore" should have anticipated. *Kirksey*, 535 F.3d at 392. The district court concluded the hole was both open and obvious and to be anticipated by a competent stevedore, and on that basis, granted summary judgment for Manson. Sure enough, some evidence in the record supports that finding. Jeff Smith testified that nothing would have obstructed J.J.'s view of the hole. Smith testified also that if J.J. had looked at the hole from four or eight feet away, he would have seen the hole. And Smith opined that, were he in J.J.'s shoes, he would not have fallen because he "double-check[s] were [he] go[es]." On the general foreseeability of holes, Smith testified that he would expect a decommissioned structure (like the platform at issue) to contain holes. Dwight Caton, the owner of MARS, likewise stated that holes are a common occurrence on decommissioned platforms.

But so too did record evidence provide a contrasting account, supporting instead the notion that the hole was a hidden hazard, one a stevedore would not anticipate. Smith, the only witness to view the hole from J.J.'s vantage point,[2] provided the contradiction (indeed, a self-contradiction of the testimony

---

[2] A panel of this court once observed that an open-and-obvious inquiry should take place from the perspective of the injured longshoreman. *See McCuller v. Nautical Ventures, L.L.C.*, 434 F. App'x 408, 412 (5th Cir. 2011) (per curiam) (explaining that a defective ladder's

cited above). On the visibility of the hole, Smith explained that the platform's "grating can play tricks on your eyes," the hole was not easily seen until one was right on top of it, and the hole "look[ed] like a solid floor." Moreover, Smith did not see the hole until J.J. began to fall through it. The hole's size (or lack thereof) is also relevant; Caton testified the hole was approximately the size of two legal pads and he "still [did not] know how a person fit through" it. Finally, we have reviewed the pictures of the hole and its surroundings, and those pictures cement further the conclusion that the hole's obviousness is subject to live dispute. True, the pictures taken directly over the hole, as one might expect, depict a visible opening. *See, e.g.*, Appendix, fig. 2. But the pictures taken from an angle—similar to the point of view of a person approaching the hole—depict the way in which the platform's grating, in Smith's words, can "play tricks on your eyes" and make the opening difficult to see. *See, e.g.*, Appendix, fig. 3. As for the hole's foreseeability, Smith clarified that, though he expected holes to be present, those holes are "typically covered" by replacing the grating or marked by "cables going all the way around." More pointedly, Smith explained that an uncovered, unmarked hole—the very danger that befell J.J.—was "just not common at all." And Caton echoed that sentiment: "usually everything is roped off."

The district court did not acknowledge this testimonial conflict in its summary-judgment opinion. Instead, the court appeared to place great weight on the procedural nuance we mentioned earlier—that of summary judgment in a bench-trial case—when it remarked, "proceeding to trial would not enhance the Court's ability to draw inferences and conclusions." The court was quite right that the *Nunez* rule allows a judge to sometimes draw inferences in

obviousness should not be gauged by what would be revealed if "the ladder was laid out flat and the rungs could be examined from several angles" but rather by what would be apparent "to a longshoreman climbing up and down the ladder"). We agree.

8

rendering summary judgment. *See* 572 F.2d at 1123–24. But neither *Nunez* nor any other case permits the court to do so when a factual dispute exists. *Id.* at 1124. Smith's divergent testimony created such a dispute here, and on the key issues no less. By adopting one side of Smith's story as "[t]he most convincing evidence" while neglecting Smith's contrary account, the court, in essence, found one version more credible than the other. And *Nunez* forbids credibility determinations on a cold summary-judgment record. *Id.* at 1123.

Judicial efficiency is a noble goal, to be sure. But when an evidentiary record contains a material factual dispute (as this one does), we simply cannot bypass the role of the fact-finder, whoever that may be. Summary judgment was improper.

E. **The *West* Caveat and Manson's Alternative Basis for Affirmance**

We pause to consider Manson's final ground for affirmance, one premised on a little-explored exception to vessel-owner liability. In a pre-*Scindia* case, *West v. United States*, 361 U.S. 118, 119 (1959), the United States hired a contractor to overhaul a deactivated vessel. A shore-based employee of the contractor suffered a repair-related injury. *Id.* at 120. The Supreme Court denied recovery because, among other things, the defect was not hidden and the vessel owner was "under no duty to protect [the employee] from risks that were inherent in the carrying out of the contract." *Id.* at 123. This circuit has applied the *West* rationale under similar circumstances. *See Hess v. Upper Miss. Towing Corp.*, 559 F.2d 1030, 1035–36 (5th Cir. 1977) (no liability when gasoline was obvious and "the danger inherent in removing gasoline . . . from a barge was well known" to the independent contractor hired to do just that); *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982) (no liability when rust on a tank's walls—the precise condition an independent contractor was retained to inspect—injured an employee of the contractor). Manson argues the *West* rule should apply here because J.J.'s role (vis-à-vis his stevedore) was to check

the platform for hazards, including holes. The LaFleur claimants reply that the record reveals J.J.'s responsibility was to investigate for oil, not holes.

Setting aside whether the evidence actually supports Manson's characterization of J.J.'s role, we decline Manson's request to affirm because we find no authority for extending the *West* exception to situations beyond (1) an open and obvious defect that (2) an independent contractor is retained by the vessel owner to repair or inspect. *West* itself acknowledged the limits of its holding. *See* 361 U.S. at 124 ("[T]here might be instances of hidden or inherent defects, sometimes called 'latent,' that would make the owner guilty of negligence, even though he had no control of the repairs . . . .").

This case is different. When control of the structure was turned over, a warning was given about oil but not holes—and this is more than a hole in the grating. Unseen is a hole in the platform underneath, and if a man slips or steps over the edge of the hole, he will fall to a terribly painful death. Surely, this danger could be found to constitute a latent hazard. And, moreover, this case involves a stevedore retained by the vessel owner to remove a structure for scrap, not to repair or inspect for particular known dangers. It is thus outside *West*'s narrow liability bar.

## III.   CONCLUSION

The judgment is reversed and the case is remanded for proceedings consistent with this opinion.

# Appendix



Fig. 1



Fig. 2



Fig. 3