# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 19, 2023

Lyle W. Cayce
Clerk

—————————

No. 22-30577

—————————

In the Matter of the Complaint of Ingram Barge Company, L.L.C., *as owner and operator of Barge IB976, doing business as Ingram Barge Company*, for Exoneration from or Limitation of Liability

Ingram Barge Company, L.L.C., as owner and operator of Barge IB976, doing business as Ingram Barge Company; American Longshore Mutual Association, Limited; T.T. Barge Cleaning Mile 183, L.L.C.; T.T. Barge Services Mile 237, L.L.C.,

*Petitioners—Appellees*,

*versus*

Gregory Ratcliff,

*Claimant—Appellant*.

—————————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CV-313

—————————————————————————

No. 22-30577

Before DUNCAN and WILSON, *Circuit Judges*, and SCHROEDER, *District Judge*.*

PER CURIAM:†

Gregory Ratcliff worked as a barge cleaner for T.T. Barge Services, which provides barge cleaning services to Ingram Barge Company. Ratcliff asserted negligence claims against Ingram after Ratcliff was injured by caustic soda that he was cleaning up on Ingram Barge 976, which was moored to one of T.T.'s work barges at the time of his injury.

After Ingram filed a district court complaint to limit liability, Ratcliff counterclaimed and asserted claims of negligence against Ingram. T.T. also filed a claim for contribution and indemnity against Ingram. T.T. and Ingram each moved for summary judgment regarding Ratcliff's claims.

The district court granted summary judgment (1) as to Ratcliff's lack of seaman status under the Jones Act and (2) as to all of Ratcliff's negligence claims against Ingram. The district court then dismissed the case with prejudice. Ratcliff challenges the district court's orders granting summary judgment. We affirm.

## I.

T.T. provides barge services in and alongside the Mississippi River. Ratcliff worked as a barge cleaner at T.T.'s Mile 183 facility, which includes shoreside offices and parking. The facility also includes two work barges[1] that float in the river: the Cleaning Barge and the Repair Barge. T.T.'s work

_____

* United States District Judge for the Eastern District of Texas, sitting by designation.

† This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

[1] Both of T.T.'s work barges are made up of three smaller barges.

2

barges are decommissioned barges moored to land by steel cables attached to sunken concrete blocks. Though decommissioned, T.T. work barges can still move on water, although they are only moved for repairs or to accommodate dredging. Readying the T.T. work barges for movement requires a crane to remove a metal walkway, calls for utility lines to be disconnected, and involves a days-long process that can take more than a week. Like many other barges, T.T.'s work barges cannot propel themselves. A T.T. work barge was once struck by a passing vessel.

Multiple customers, including Ingram, bring their barges to T.T.'s facilities for cleaning or repair services. Customers park their barges alongside T.T.'s work barges and moor their barges to T.T.'s work barges. During cleaning or repair, customer barges remain moored and stationary while T.T.'s barge cleaners and repairmen board and work on the customer barges. The barge cleaners and repairmen are assigned to work on different customer barges from various customers each day. T.T.'s barge cleaners and repairmen do not leave T.T.'s facility on the customer barges. However, even though company policy forbids it and T.T. denies that it occurs, Ratcliff alleges that sometimes T.T.'s barge cleaners and repairmen ride customer barges about 200–360 feet between the work barges (presumably to avoid a longer walk over land).

Ratcliff was injured by caustic soda burns while cleaning Ingram Barge 976. Ingram hired T.T. to clean the caustic soda out of the barge. The caustic soda was frozen and extended along the walls and the ceiling. Ratcliff and his team were aware they would be cleaning caustic soda. Ratcliff's foreman informed Ratcliff that the caustic soda was frozen in Ingram Barge 976 while explaining morning assignments before he entered the barge. Upon entering the barge, Ratcliff saw that the frozen caustic soda extended to the ceiling but alleged that he was surprised to see it on the ceiling. Ratcliff's foreman and work team also noticed the frozen caustic soda on the ceiling. Ratcliff's

foreman began spraying the caustic soda on the ceiling and warned Ratcliff to back away. About an hour-and-a-half after Ratcliff entered the barge and saw the caustic soda on the ceiling, Ratcliff was burned on one of his arms and one of his legs by drops of caustic soda that had thawed and dripped down. However, Ratcliff continued working after pausing to change into a new "slicker suit" after the drops of caustic soda that injured him had burned his original suit. Later, Ratcliff slipped and fell in a pool of caustic soda and suffered more extensive and severe burns. Ratcliff alleges the caustic soda pool that more severely injured him was created by the frozen caustic soda on the ceiling thawing, dripping down, and pooling. At the time of his injury, Ratcliff alleges he was new to cleaning caustic soda and was unfamiliar with the proper personal protective equipment for cleaning caustic soda.

Ratcliff originally filed a state court petition against Ingram and T.T. (among others) alleging that he was a Jones Act seaman. Ingram then filed a complaint in the Middle District of Louisiana to limit liability regarding Ratcliff's state court claims. The district court enjoined prosecution of the state court claims.

Before the district court, Ratcliff answered and counterclaimed, asserting claims of negligence against Ingram. Among claims by other parties, T.T. filed a claim for contribution and indemnity against Ingram under general maritime law, including a claim for contribution should Ratcliff qualify as a Jones Act seaman.

T.T. moved for summary judgment as to Ratcliff's lack of seaman status. Ingram separately moved for summary judgment as to all of Ratcliff's negligence claims against Ingram. The district court granted both motions for summary judgment and dismissed the case with prejudice. Ratcliff appealed.

No. 22-30577

## II.

Ratcliff raises three issues on appeal. He argues that the district court erred (A) in finding the T.T. Cleaning Barge lacked vessel status under the Jones Act at summary judgment, (B) in granting summary judgment as to Ratcliff's lack of seaman status under the Jones Act, and (C) in granting summary judgment as to all of Ratcliff's negligence claims against Ingram. Reviewing these arguments in turn, we determine that the district court committed no error.

## A.

Ratcliff first argues that the district court erred in finding that T.T.'s Cleaning Barge lacked vessel status when it granted summary judgment as to Ratcliff's lack of seaman status under the Jones Act. We disagree.

Grants of summary judgment are reviewed *de novo*, including as to Jones Act and Longshore Act claims. *See, e.g.*, *Sanchez v. Smart Fabricators of Tex., L.L.C.*, 997 F.3d 564, 568 (5th Cir. 2021) (en banc). The *de novo* standard of review applies here.

Ratcliff contests vessel and seaman status here because they affect whether the Jones Act applies and consequently which remedies, if any, he may seek. The remedies available under the Jones Act and the Longshore and Harbor Worker's Compensation Act (the "Longshore Act") are "mutually exclusive" of one another. *Id.* at 569. If a worker qualifies as a Jones Act seaman, the worker may sue his employer for Jones Act negligence, the owner of a vessel he works on for unseaworthiness, and a third party for general maritime law negligence. *See id.* at 568–69; *Becker v. Tidewater, Inc.*, 335 F.3d 376, 386–87 (5th Cir. 2003). However, if the worker fails to qualify as a Jones Act "seaman" and is instead classified as a longshoreman under the Longshore Act, no negligence claims are available against the longshoreman's employer and he may sue a third-party vessel under a

restrictive theory of negligence that only provides three specific duties of care.[2] *Becker*, 335 F.3d at 386–87; *see Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008); *see also Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 171–79 (1981) (explaining that the Longshore Act permits a restrictive theory of negligence against a third-party vessel).

"The Jones Act does not define the term 'vessel', and this Court has repeatedly held that the term is incapable of precise definition." *Ducote v. V. Keeler & Co.*, 953 F.2d 1000, 1002 (5th Cir. 1992). Instead, the Rules of Construction Act explains that the term "'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. But the Supreme Court rejects an "anything that floats" approach to defining the term. *Lozman v. City of Riviera Beach*, 568 U.S. 115, 126 (2013).

The Supreme Court has explained that "a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497 (2005). But the Court later clarified that a watercraft does not fall within the definition of vessel "unless a reasonable observer, looking to the [watercraft]'s physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Lozman*, 568 U.S. at 121. And a watercraft is not a vessel "if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Stewart*, 543 U.S. at 494.

T.T. and Ingram argue that T.T.'s barges, including T.T.'s Cleaning Barge, are merely work platforms essentially functioning as docks that are

---

[2] And a longshoreman may "sue nonvessel third parties under general maritime law tort principles." *Becker*, 335 F.3d at 387.

permanently moored and connected by steel cables to sunken concrete blocks called "deadmen." T.T. and Ingram point out that T.T.'s barges are rarely moved and can only be moved after an intensive, days-long process that can take over a week to ready the work barges for movement. And the barges are only moved to make repairs or accommodate dredging operations. T.T. and Ingram also point out that T.T.'s barges are not intended or allowed to be moved under T.T.'s regular U.S. Coast Guard plan.[3]

On the other hand, Ratcliff argues that T.T.'s Cleaning Barge is a barge that can and does move on water. Ratcliff admits that T.T.'s work barges are decommissioned barges that only move periodically. But Ratcliff contends that means T.T.'s barges are only temporarily moored. Based on the T.T. barges' physical characteristics and activities, Ratcliff argues that T.T.'s work barges satisfy *Lozman*'s test for vessel status because a reasonable observer would consider T.T.'s work barges designed to a practical degree for carrying people or things over water.

T.T. and Ingram cite older case law to suggest that the purpose of T.T.'s Cleaning Barge should be considered here. *Ducrepont v. Baton Rouge Marine Enters.*, 877 F.2d 393, 395 (5th Cir. 1989); *Daniel v. Ergon, Inc.*, 892 F.2d 403, 407–08 (5th Cir. 1990). *Ducrepont* and *Ergon* applied the *Bernard* factors, the first of which considers whether "the structures involved were constructed and used primarily as work platforms." *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 831 (5th Cir. 1984). *Ducrepont* affirmed summary judgment and determined that a floating barge used primarily as a work platform for cleaning and repairing barges was not a vessel despite not being

_____

[3] T.T. also argues its barges lack any means of self-propulsion. While that physical characteristic may be relevant, it "is not dispositive." *Lozman*, 568 U.S. at 122. And as Ratcliff points out, it is undisputed that Ingram Barge 976 is a vessel although it lacks any means of self-propulsion.

constructed as a work platform. 877 F.2d at 395. *Ergon* similarly determined that a floating barge cleaning and stripping platform moored to the shore by wires was not a vessel for Jones Act purposes as a matter of law and stated that the magistrate judge had erred in failing to grant summary judgment. 892 F.2d at 407–09. *Ergon* also determined that the barges used primarily as work platforms in *Ergon* and *Ducrepont* were indistinguishable despite minor differences like whether the barges were subject to Coast Guard inspection or whether the barges had been tugged to different locations. *Id.* at 407–08.

Ratcliff cites subsequent case law that focuses on a watercraft's moving capabilities. *See Ducote*, 953 F.2d at 1002–04. In *Ducote*, we reversed summary judgment because a jury could find that a movable spud barge subject to "planned extensive movement" was a Jones Act vessel despite it being moored at the time of a crane operator's accident and having not been moved any considerable distance during the course of the project during which the crane operator was injured. *Id.* at 1004.

We decline to ultimately determine vessel status here based on *Ducrepont*, *Ergon*, or *Ducote* because all those cases predate both *Lozman*'s reasonable observer test and *Stewart*. *Stewart* suggests that the primary purpose analysis used in *Ducrepont* and *Ergon* is no longer dispositive. *See Stewart*, 543 U.S. at 497 (explaining that "a 'vessel' is any watercraft practically capable of maritime transportation, *regardless of its primary purpose* or state of transit at a particular moment") (emphasis added). Moreover, *Ducote* distinguishes itself on the facts from cases like the instant case where "barges rendered immobile for extended periods of time and used as construction platforms or dry docks are not vessels" because the spud barge in *Ducote* "was moved at least a short distance every day." *Ducote*, 953 F.2d at 1004 n.18.

We instead focus our analysis on *Lozman* and *Stewart*. In *Lozman*, the Supreme Court clarified *Stewart* and explained that "the statutory definition [of vessel] *may* (or may not) apply—not that it *automatically must* apply— where a structure has some other *primary* purpose, where it is stationary at relevant times, and where it is attached—but not permanently attached—to land." *Lozman*, 568 U.S. at 124. In clarifying *Stewart*, *Lozman* further explains that the "basic difference" between a vessel's purpose and a nonvessel's purpose is whether the watercraft in question "was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water." *Id.* at 125. *Lozman* explains that the dredge in *Stewart* was a vessel because it was regularly used to transport dredging personnel and equipment over water despite being used primarily for dredging; but that the wharfboat in *Evansville*, which was primarily used for cargo transfer while being attached to or floating near a dock, was not a vessel because it was not regularly used for, or designed to any practical degree to be used for, transportation despite being annually towed away in the winter to avoid ice. *Id.* at 124–25 (comparing *Stewart*, 543 U.S. at 493–95, with *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 (1926)).

Here, applying *Lozman* to the summary judgment record viewed in the light most favorable to Ratcliff, T.T.'s Cleaning Barge is not regularly used to transport workers or equipment over water. Instead, T.T.'s Cleaning Barge is semi-permanently and indefinitely attached to land by steel cables, except for rare moves during repairs or to accommodate nearby dredging operations. *See Stewart*, 543 U.S. at 494 (explaining that a "floating casino was no longer a vessel where it 'was moored to the shore in a semi-permanent or indefinite manner'" (quoting *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995))). Preparing to move T.T.'s Cleaning Barge can take over a week and requires removing a metal walkway and disconnecting utility lines. And T.T.'s Cleaning Barge is stationary at all

relevant times when Ratcliff and other barge cleaners work on it. Therefore, a reasonable observer would not consider T.T.'s Cleaning Barge designed to a practical degree for carrying people or things over water.

Additionally, Ratcliff argues that T.T. applies the incorrect standard of review because whether T.T.'s barges qualify as vessels is a fact question left to the jury and not subject to garden-variety summary judgment review. However, both cases that Ratcliff cites for this proposition further explain that summary judgment may be appropriate when deciding whether a watercraft is a vessel under the Jones Act "where the facts and the law will reasonably support only one conclusion." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 373 (1995); *see Ducote*, 953 F.2d at 1002–03 ("[S]ummary judgment may be appropriate when there is no evidence from which reasonable persons might draw conflicting inferences on any of the elements of the seaman test."). The uncontroverted facts and law here only support the conclusion that T.T.'s Cleaning Barge does not qualify as a vessel under the Jones Act. Therefore, the district court did not err in finding that T.T.'s Cleaning Barge lacked vessel status at summary judgment.[4]

## B.

Ratcliff next argues that the district court erred in granting summary judgment as to Ratcliff's lack of seaman status under the Jones Act. We disagree.

To qualify as a Jones Act seaman, a plaintiff must satisfy two requirements. First, "an employee's duties must 'contribut[e] to the *function* of the vessel or to the accomplishment of its mission.'" *Chandris*, 515 U.S. at

---

[4] This determination comports with a district court decision granting summary judgment after finding T.T.'s work barges are not vessels under the Jones Act. *See Young v. T.T. Barge Servs. Mile 237, LLC*, 290 F. Supp. 3d 562, 567 (E.D. La. 2017).

No. 22-30577

368 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355, (1991) (emphasis added). Second, that employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *duration* and its *nature*." *Id.* (emphasis added). *Chandris* explained:

> The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

*Id.* Sitting en banc, the court provided three factors to be considered in determining whether the "substantial connection" requirement is met:

> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?
>
> (2) Is the work sea based or involve seagoing activity?
>
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Sanchez*, 997 F.3d at 574.

Because T.T.'s Cleaning Barge does not qualify as a vessel, the rest of the analysis as to Ratcliff's seaman status under the Jones Act focuses on Ratcliff's connection to Ingram's barges (including Ingram Barge 976), which the parties do not dispute are Jones Act vessels. Applying the *Chandris* requirements and *Sanchez* factors, Ratcliff lacks a substantial connection to

11

Ingram's barges. Therefore, Ratcliff does not qualify as a seaman under the Jones Act.

First, Ratcliff argues that he satisfies *Chandris*'s "very broad" threshold function requirement that he "contribute to the function of the vessel or to the accomplishment of its mission." *See Chandris*, 515 U.S. at 368, 377. Second, Ratcliff argues that he satisfies *Chandris*'s duration prong of the substantial connection requirement that is generally met if a worker spends a minimum of 30 percent of his time aboard a vessel. *See Chandris*, 515 U.S. at 371. Third, however, even assuming these are met, Ratcliff fails to satisfy *Chandris*'s nature prong of the substantial connection requirement based on the three *Sanchez* factors.

The first *Sanchez* factor asks: "[d]oes the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?" *Sanchez*, 997 F.3d at 574. Ingram argues that Ratcliff owed his allegiance to a shoreside employer because he reported to work and received assignments from T.T.'s shoreside offices, not Ingram's fleet. Ratcliff argues that he owed allegiance collectively to both Ingram and T.T. Here, Ratcliff owed allegiance to his shoreside employer, T.T., for which he directly worked—not one of T.T.'s multiple customers for which he may have been assigned to clean one of their barges on any given day. Therefore, the first *Sanchez* factor weighs against Ratcliff satisfying *Chandris*'s substantial connection requirement.

The second *Sanchez* factor also does not weigh in favor of Ratcliff satisfying *Chandris*'s substantial connection requirement. It asks: "[i]s the work sea-based or involve seagoing activity?" *Id.* Ratcliff argues that his work on Ingram's barges was seagoing and he was exposed to the perils of the sea because (a) Ingram's barges were directly in the Mississippi River and at risk of collision with mid-river watercraft that had previously struck T.T.'s cleaning barge, (b) Ratcliff had previously slept at T.T.'s facility, and

(c) Ratcliff had previously rode Ingram's barges about 200 feet between T.T.'s Repair Barge and Cleaning Barge despite T.T. company policy against such rides. Denying the rides happened, T.T. argues that any such rides on Ingram's barges violated T.T. company policy and were taken merely as passengers to avoid walking on land from one tier of the facility to another. Ingram argues Ratcliff's work cannot be seagoing because Ratcliff has admitted that (1) Ingram's barges were always moored during Ratcliff's cleaning duties, including during the time of the accident; and (2) Ratcliff had no duties with respect to any moving barges or vessels.

Here, Ingram's arguments show that Ratcliff's barge cleaning work was not sea-based and did not involve seagoing activity. And Ratcliff's arguments can be distinguished. That a T.T. work barge was once struck does not make Ratcliff's cleaning work aboard nearby Ingram barges any more "seagoing" than an object can become "seagoing" just because a nearby dry dock has been struck. And Ratcliff only claims that he slept at T.T.'s facility, not aboard Ingram's barges. Only the alleged 200-foot customer barge rides against company policy suggest any sea-based work or seagoing activity—and those hardly subject Ratcliff to the perils of the sea. Even viewing that fact in the light most favorable to Ratcliff at summary judgment, the second *Sanchez* factor is neutral at best and cannot help Ratcliff satisfy *Chandris*'s substantial connection requirement.

The third *Sanchez* factor asks: "(a) [i]s the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) [d]oes the worker's assignment include sailing with the vessel from port to port or location to location?" *Id.* Here, as Ingram points out, Ratcliff admits that his discrete task ends when he is finished cleaning Ingram's barges—in Ratcliff's own words, he is then "done with it." And any 200-foot barge rides cannot constitute sailing from port to port. Ratcliff provides little resistance against Ingram's and T.T.'s

No. 22-30577

arguments regarding this third factor. Therefore, the third *Sanchez* factor weighs against Ratcliff satisfying *Chandris*'s substantial connection requirement.

Based on the summary judgment evidence viewed in the light most favorable to Ratcliff, the *Sanchez* factors weigh against Ratcliff satisfying *Chandris*'s substantial connection requirement at least regarding the nature of that connection. Therefore, Ratcliff does not qualify as a Jones Act seaman. Accordingly, the district court did not err in granting summary judgment as to the lack of Ratcliff's seaman status under the Jones Act.

## C.

Ratcliff argues that, even if the Longshore Act applies, the district court erred in granting summary judgment and finding that Ingram owed no duty under the Longshore Act. We disagree.

Section 905(b) of the Longshore Act applies here. 33 U.S.C. § 905(b). Under § 905(b), vessel owners "owe three narrow duties to longshoremen: (1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene." *Kirksey*, 535 F.3d at 391. Only the turnover duty is at issue in this case:

> The turnover duty encompasses two distinct-but-related obligations. First, the vessel owner "owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety." [*Kirksey*, 535 F.3d at 392.] And second, the vessel owner "owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it." *Id.* However, a vessel owner need not warn of "dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." *Id.*

*Manson Gulf, L.L.C. v. Mod. Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017).

While the district court addressed the turnover duty to warn as to the frozen caustic soda generally, Ratcliff now emphasizes that the frozen caustic soda *on the ceiling* of the barge created a hidden or latent danger. Though Ingram warned T.T. about "2 inches per tank" of caustic soda buildup, Ratcliff alleges the warning did not extend to frozen caustic soda on the ceiling. Here, like *Manson Gulf*, claimant's "turnover-duty claim hinges on whether the [danger] was hidden or was instead (1) open and obvious or (2) a danger 'a reasonably competent stevedore' should have anticipated." *Id.* at 135 (citation omitted).

But here, unlike *Manson Gulf*, no summary judgment evidence viewed in the light most favorable to Ratcliff can show that the danger of frozen caustic soda on the ceiling was not open and obvious. Ratcliff himself[5] confirmed that he saw caustic soda on the ceiling of the barge and dripping down as he entered the barge. According to Ratcliff's own testimony, he first saw the caustic soda on the ceiling an hour-and-a-half before he was initially injured on his arm and leg by falling drops of caustic soda.[6] Ratcliff's foreman and work team also saw the caustic soda on the ceiling and dripping down. Ratcliff's foreman warned Ratcliff and his work team to stand back as he sprayed the frozen caustic soda to clean it off the ceiling. All these facts contrast with the obscured platform hole in *Manson Gulf* that played "tricks

---

[5] Ratcliff's own testimony is prioritized here because "an open-and-obvious inquiry should take place from the perspective of the injured longshoreman." *Manson Gulf*, 878 F.3d at 136 n.2.

[6] Ratcliff alleges that caustic soda lacks color and odor, at least in some form. But Ratcliff nevertheless testified that he could see the frozen or dry caustic soda buildup on the ceiling of the barge as it thawed and dripped down.

on your eyes" and others did not see until the *Manson Gulf* claimant fell through the hole. *Id.* at 136. Therefore, no genuine issue of material fact exists as to the openness of and obviousness of the caustic soda on the ceiling that dripped down.[7]

Ratcliff's surprise upon finding the danger of caustic soda on the ceiling of the barge cannot change the fact that Ratcliff and others found the danger open and obvious.[8] Ratcliff's surprise might factor into the analysis of whether the caustic soda on the ceiling was a danger a reasonably competent stevedore should have anticipated encountering. But we need not proceed with that analysis given that the danger here is open and obvious. *See id.* at 134 (explaining that "a vessel owner need not warn of dangers which are *either*: (1) open and obvious *or* (2) dangers a reasonably competent stevedore should anticipate encountering") (emphasis added) (internal quotations omitted).

That Ratcliff was new to and unfamiliar with cleaning caustic soda and was not provided the proper personal protective equipment lacks relevance

---

[7] Moreover, no genuine issue of material fact exists as to the openness and obviousness of the pool of caustic soda on the floor. By Ratcliff's own account of the facts, he saw the caustic soda dripping down and had already been injured by the falling drops of caustic soda, which caused him to change his slicker suit. Therefore, the pool of caustic soda on the floor, which Ratcliff alleges was created by the frozen caustic soda thawing and dripping down, would have been open and obvious to Ratcliff.

[8] Other evidence refutes Ratcliff's alleged element of surprise. Ingram points to evidence suggesting that T.T. received pictures of the barge's condition before work began, a T.T. representative performed a check of the barge before cleaning began, and that T.T. determined a "Butterworth" spray of the ceiling was necessary before entering the barge. However, Ratcliff's testimony that he was surprised would at least create a factual dispute as to whether it would have been surprising. Nevertheless, this factual dispute as to surprise does not inform the open and obvious inquiry here—in other words, even if Ratcliff was surprised to see the caustic soda on the ceiling as he entered the barge, such surprise does not preclude the danger from being open and obvious.

as to whether the frozen caustic soda on the ceiling was open and obvious. Those facts would be relevant if we analyzed the need to warn under the "reasonably competent stevedore" standard or if Ratcliff could assert negligence claims against T.T., his employer. But those facts lack relevance to the openness and obviousness inquiry here as it relates to whether to impose the narrow turnover duty to warn of hidden or latent dangers against Ingram.

At oral argument, Ratcliff clarified his argument to explain that Ingram breached its turnover duty to warn the moment Ratcliff stepped foot inside the barge and before Ratcliff was injured. But Ratcliff's temporal distinction is unpersuasive. The danger of caustic soda on the ceiling remained open and obvious.

The openness and obviousness of the caustic soda on the ceiling negated the turnover duty to warn. Accordingly, Ingram owed Ratcliff no turnover duty to warn of the caustic soda on the ceiling. *See Kirksey*, 535 F.3d at 397 (determining a "vessel had no turnover duty to warn against the defect or to correct the unsafe condition" because it was open and obvious); *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1036 (5th Cir. 1977) (discerning "no basis for imposing a duty of care on the defendants" where the danger "was well known to all concerned").

Ratcliff fails to show that the alleged high degree of danger changes the analysis here. Ratcliff presents his argument regarding the high degree of danger in the context of the *West* exception. The *West* exception may excuse a vessel owner from a duty to protect an independent contractor "from risks that were inherent in the carrying out of the contract." *Hill v. Texaco, Inc.*, 674 F.2d 447, 452 (5th Cir. 1982) (quoting *West v. United States*, 361 U.S. 118, 123 (1959)). Ratcliff attempts to distinguish cases where the *West* exception applies by arguing the danger is far more dangerous here. By arguing the *West*

exception does not apply to the frozen caustic soda on the ceiling, Ratcliff essentially asks to limit the application of the *West* exception when a danger's quantity, condition, or location is unexpected. But we need not determine whether the *West* exception applies, or whether it should be limited, because Ingram owes Ratcliff no duty to warn in the first place given the openness and obviousness of the danger.[9]

Ratcliff also asserts that Ingram breached its duty to warn of hidden or latent dangers by violating industry standards in a way that caused or contributed to Ratcliff's injuries. Ratcliff alleges that industry standards obligated Ingram to send a representative to check the barge and conduct a job safety analysis so that it could properly warn Ratcliff of hidden or latent dangers. However, as already determined, Ingram owed Ratcliff no turnover duty to warn of hidden or latent dangers based on the openness and obviousness of the danger here. Therefore, these allegations cannot raise a genuine issue of material fact.

Lastly, Ratcliff argues that Ingram breached its distinct-but-related obligation to furnish a reasonably safe ship under the turnover duty by failing to provide a first aid kit on its barge. Ratcliff alleges that Ingram had a duty to provide the first aid kit because it was an industry standard. The district court did not analyze Ingram's separate turnover duty "to exercise ordinary care under the circumstances to turn over the ship and its equipment in such

---

[9] At oral argument, Ratcliff further contended that the "distinction between knowledge of a condition and knowledge of the dangerousness of that condition" prevented the danger of caustic soda on the ceiling from being open and obvious. *See Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990). But *Randolph* applied that distinction while analyzing a vessel owner's duty to intervene, not a vessel owner's turnover duty. *Id.* Ratcliff fails to cite any authority for imposing a turnover duty on a vessel owner based on a high degree of danger regardless of the openness and obviousness of that danger, and we decline to create any such authority.

condition that an expert stevedore can carry on stevedoring operations with reasonable safety," *Manson Gulf*, 878 F.3d at 134 (citation omitted), in its order granting summary judgment as to Ingram. But that makes no difference here. This Circuit has already determined that the openness and obviousness of a danger may also negate the turnover duty to furnish a reasonably safe ship. *Kirksey*, 535 F.3d at 397. Moreover, Ratcliff points to no summary judgment evidence of any industry standard relating to first aid kits.[10] Therefore, even if some factual dispute exists as to whether the lack of a first aid kit contributed to Ratcliff's injury, no genuine issue of material fact arises because Ratcliff cannot connect any such failure to Ingram's turnover duty to furnish a reasonably safe ship based on the summary judgment evidence.

## III.

For the reasons set forth above, Ratcliff's arguments fail. Accordingly, the district court's orders granting summary judgment are

AFFIRMED.

---

[10] Instead, as Ingram points out, evidence shows that T.T. inspected Ingram Barge 976 upon arrival and before beginning any work on it and concluded that no conditions existed that would prevent the cleanup work from safely occurring. And T.T. Barge's corporate representative further testified that T.T. Barge has no criticism of Ingram—or the condition of its barge—related to Ratcliff's alleged injuries.